Argued November 29, 1950, affirmed January 10, 1951

SCHMIDT ET UX. *v.* FITZSIMMONS ET UX.

226 P. (2d) 306

*John H. Carson,* of Salem, argued the cause for appellants. With him on the briefs was W. Douglas Harris, of Mt. Angel.

*W. C. Winslow,* of Salem, argued the cause for respondents. With him on the brief was Norman K. Winslow, of Salem.

416

Before Lusk, Chief Justice*, and Brandt†, Latou-
rette, Warner and Tooze, Justices.

WARNER, J.

This is a suit for a declaratory judgment deter-
mining whether the vendors or the vendees shall sus-
tain the loss of escrowed funds embezzled by the escrow
agent with whom they were deposited. The Schmidts,
as plaintiffs, appeal from a decree dismissing their
complaint and entering a decree in accordance with the
prayer of the answer of the Fitzsimmonses, as defend-
ants.

The case at bar has its origin in the sale of a parcel
of farm land situated near Mt. Angel, Oregon, which
was owned by the plaintiffs and purchased by the de-
fendants, whom we shall hereinafter respectively refer
to as the sellers and buyers. The deal was made
through the offices of Charles Delfel Company, a cor-
poration (hereinafter called Delfel Company) where
the sellers had listed their property for sale. A pay-
ment of $1,625.00 was made by the buyers at the time
they executed the sales agreement on October 24, 1946.
A second cash payment of slightly in excess of $10,-
000.00 was required to be made "on examination of
the title." The sellers were to furnish at their option
"either an abstract or title insurance policy * * *
showing good and marketable title" and five days
were allowed to buyers for its examination. The buyers
were to have possession of the property "on or before
60 days."

More or less coincident with the release of the title
company's preliminary title report dated January 7,

---

* Chief Justice when this case was argued.
† Chief Justice when this opinion was rendered.

1947, showing certain defects requiring a survey as a condition precedent to the issuance of a policy insuring a merchantable title in the sellers, an acutely necessitous situation arose in the Fitzsimmons family. It appears that very shortly before that date, they, in reliance upon their belief that they could immediately enter into possession of the Schmidt place, had sold their Portland home under conditions requiring them to immediately vacate in favor of their purchasers. However, the Schmidts refused to give the Fitzsimmonses possession of the Mt. Angel farm until they made the payment of $10,000.00 above referred to. This rendered the situation of the Fitzsimmonses even more desperate as they were then packed and ready to move. The parties very quickly thereafter, and on January 11, 1947, met in the Portland office of the Delfel Company "to close the deal," as they put it, that is, to pay the required sum of money to the sellers and thereby place the buyers in a position to take immediate possession. It was a relatively short meeting or, as stated by one witness, "not much of a meeting." The required money was then paid by the Fitzsimmonses to the Delfel Company, as the sellers' agent, thereby rendering the buyers current as to their financial obligations under the sales agreement and enabling them to move onto the farm, and this the record shows they did within a day or so thereafter.

The buyers shortly before the Portland meeting had expressed some unwillingness to make the $10,-000.00 payment unless they had some assurance that they could eventually get a clear title. The matter was again briefly discussed in the Delfel Company's office on January 11, but without making any provision therefor. The parties agreed, however, to adjourn

and meet in Mt. Angel in the office of W. D. Harris on January 14, 1947. There is nothing before us to indicate that the $10,000.00 payment made by the Fitzsimmonses on January 11 was made with or received by the Delfel Company encumbered with any conditions, restrictions or limitations of any kind imposed or attached by the buyers which would have inhibited the Delfel Company from delivering all of it to the Schmidts on that date. It is noteworthy that none of the parties make any representations to the contrary.

The object of the second meeting was the execution and delivery of the deed, mortgages and note required by the sales agreement and the renewal of negotiations for a plan to insure performance on the part of the sellers in eliminating the defects shown by the title report.

We are persuaded that when the parties left the Portland office of the Delfel Company that day, they had not agreed upon the form of the protection, if any, that the buyers were to receive, nor on the amount or place of the deposit, if there was to be an escrow, nor, indeed, if an escrow, whether the deposit would be in the form of money or a note of the sellers to the buyers. All of these items became subjects of animated argument in Mr. Harris' office before the agreement and instructions relating to the escrow were drawn and signed there that day.

The first meeting had, however, accomplished the primary purposes of its calling: the Schmidts received payment in full of the money they were demanding as a condition precedent to possession by the Fitzsimmonses, and the Fitzsimmonses, on the other hand, were thereby able to extricate themselves from the

embarrassing situation resulting from the enforced vacation of their Portland home.

The meeting in Harris' office on January 14 was attended by all present at the Portland meeting and with Mr. Harris in addition. We are able to find enough in the record of what was then and there said and done to justify us in the belief that it was at the Mt. Angel meeting that the parties for the first time agreed on a pattern designed to insure that the buyers would ultimately receive a good and marketable title. Their conclusions were reflected by two writings which they then executed. One was labeled "Agreement" and left "$2000.00 of the funds now in the possession of Charles Delfel Company" in the continued possession of that organization "to be held in escrow until such time as the objections contained in the Title Report of Salem Abstract Company have been cleared and a free and clear title can be obtained." The other document was a related one addressed to the Delfel Company and entitled "Escrow Instructions."

The sellers thereafter proceeded promptly to arrange for the necessary surveys and deeds from adjoining landowners. Through no fault of the sellers, these details were not completed until the following July, and the title company did not indicate its readiness to issue the required policy until September 17, 1947.

About the first of June, 1947, the Delfel Company embezzled and converted to its own use or the use of its officers the $2,000.00 of escrowed funds which had been deposited with it. The escrow agent and all persons chargeable with the misappropriation are insolvent.

Some time after September 17, 1947, the sellers

offered to execute to the buyers a deed predicated upon the corrected descriptions as determined by the survey and required by the title company, but only upon payment to them by the buyers of the sum of $2,000.00 and upon delivery to the sellers of the buyers' note and mortgages required by the sales agreement of October 24, 1946.

The Fitzsimmonses refused to pay the sum of $2,000.00 then demanded by the Schmidts. They contended that the money lost through the defalcation of the Delfel Company fell upon the Schmidts rather than upon them. It was this difference in viewpoint which produced the present suit for a declaratory judgment and which resulted in dismissal of plaintiffs' complaint and a decree of specific performance in favor of defendants.

■ If property in the custody of an escrow holder is either embezzled or lost by it, then, as between the seller and the buyer, the loss falls on the one who owns the said property at the time of the embezzlement or loss. *Foster v. Elswick,* 176 Ark. 974, 4 S. W. 2d 946, 57 A. L. R. 1244; *Crum v. City of Los Angeles,* 110 Cal. App. 508, 294 P. 430; *Hildebrand v. Beck,* 196 Cal. 141, 236 P. 301, 39 A. L. R. 1076; *Angell v. Ingram,* (Wash.) 213 P. 2d 944, 945; *Lieb v. Webster,* 30 Wash. 2d 43, 190 P. 2d 701, 705.

■■ Under the foregoing rule, we have no alternative except to hold that at the time of the embezzlement, the funds deposited were the property of the plaintiffs.

Delfel Company was the Schmidts' agent when the Fitzsimmonses made their last payment of $10,000.00 to it in its Portland office on January 11, 1947. A payment made to an agent having authority, either express or implied, to receive the payment is a payment

to the principal. *Eugene School District No. 4 et al. v. Fisk,* 159 Or. 245, 79 P. 2d 262; 40 Am. Jur., Payment, 728, § 24; 48 C. J., Payment, 589, § 4. Delfel Company had such authority. It was from this balance that the escrowed funds were taken three days later at the meeting in Mr. Harris' office. The Portland meeting was directly incident to defendants' great anxiety to have a place to move to immediately following their vacation of their recently sold Portland property. Their primary concern was to get a place in which to live. The Schmidts' only interest was to get their last payment. Notwithstanding their expressed willingness to later at Mt. Angel enter into some form of an agreement which would protect the Fitzsimmonses while sellers were perfecting the title, there is nothing in the testimony to show that on January 11 the Schmidts had relented one iota in their original demand for the full payment of the $10,000.00 as a condition precedent to placing the buyers in immediate possession. Under the facts, as we find them, had the embezzlement occurred in the three-day interim between the Portland meeting and the Mt. Angel meeting, we seriously doubt that the Schmidts would have had the temerity to assert that the lost money was the Fitzsimmonses' money and not theirs, even if at the Portland meeting it had been clearly and certainly agreed, as it was not, that the Schmidts would at the time of the Mt. Angel meeting set aside $2,000.00 of that money in accordance with an escrow agreement to be later drawn and signed.

The "Seller's Copy" of the "Closing Agreement" executed by the Delfel Company and handed to the Schmidts on the day of the Mt. Angel conference weighs heavily in support of our conclusion that the last payment made by the Fitzsimmonses became the Schmidts'

money on January 11. From that bit of evidence we there find, among other things, under the printed caption "Receipts to Seller's Credit (Include only items received by Broker)," the printed words "Cash on Closing" followed by the amount "10495.45" in writing. The last printed matter on this "Closing Statement" is a receipt for monies, concluding with the words "and said Closing Statement approved * * *." This receipt and approval are signed by both of the plaintiffs in their capacity as sellers, clearly indicating to us that plaintiffs regarded the $10,495.45, including as it did the $2,000.00 which three days later they placed in escrow, as their money and not that of the Fitzsimmonses.

The decree of the lower court is affirmed with costs to neither party.