Argued October 14, modified December 9, 1953, petition
for rehearing denied January 6, 1954

GERIG ET UX. *v.* RUSS ET AL.

264 P. 2d 1045

*John A. Heltzel,* of Salem, argued the cause and filed a brief for appellants.

*George A. Rhoten,* of Salem, argued the cause for respondents. On the brief were Rhoten, Rhoten & Speerstra, and Ervin W. Potter, of Salem.

Before LATOURETTE, Chief Justice, and WARNER, TOOZE and PERRY, Justices.

LATOURETTE, C. J.

The question on this appeal is whether the sellers or the purchasers of real property shall bear the loss of moneys paid by the purchasers to a real estate broker, an agent of the sellers, who embezzled the same. The trial court entered a decree in favor of the purchasers, from which decree the sellers appeal.

The facts are as follows: The defendants, being the owners of approximately 103 acres of land in Marion county, gave the Larsen Home & Loan Company, a real estate broker, an exclusive listing contract for the sale of said property at a price of $23,500. The contract reads as follows:

"Salem, Oregon, April 1, 1949
"To Larsen Home & Loan Co.
164 S. Commercial St. Salem, Oregon
"For value received, you are hereby employed and given the exclusive right to sell or exchange the property described on this listing form at the price and terms noted hereon. You are hereby authorized to accept a deposit on the purchase price and, in my name, to execute a binding contract for the sale of said property. In the event that you find a buyer ready and willing to enter into a deal for said price and terms, or such other terms and price as I may accept, or in the event of any sale, ex-

change or conveyance of said property during the life of this contract, or that you place me in touch with a buyer to whom at any time within 90 days after the termination of this contract I may sell or convey said property, I hereby agree to pay you in cash for your said services five per cent of the sale or exchange price. I agree to make the purchaser a good and sufficient conveyance and to furnish either title insurance or a complete abstract showing marketable title. I hereby warrant that I am the owner of said property, that the information given above is true, that the property covered hereby is free of incumbrances except as stated and except taxes for the current fiscal year which are to be prorated. In case of an exchange, you may accept compensation from the other party to the exchange as well as myself. I hereby authorize you and your clients to enter any part of said property at any reasonable time to inspect same. The exclusive character of this agreement expires on *till notified* 19— but this contract will continue in force thereafter as a nonexclusive listing until canceled by owner in writing. I further allow you a reasonable time thereafter to close any deal on which earnest money is then deposited. In case I withdraw the authority hereby given during the exclusive period of this contract, I hereby agree to pay such additional sums as the Court may adjudge reasonable as attorney's fees.

Legal Description ————————————————

"I hereby certify that I have received a carbon copy of this listing. Accepted this 1 day of April, 1949.

"G. A. Russ

"Listed by T.H.        "Owner's signature."

On the reverse of the contract is the notation, "Approx 103 A. $23,500   *   *   *   Terms Open."

Subsequent thereto the broker obtained prospective purchasers who were willing to pay $21,500 for the

property, whereupon they entered into the earnest money agreement hereinafter set out. The broker then approached the owners, defendants, and submitted the counteroffer, which counteroffer was confirmed and approved by the sellers on the face of the earnest money contract, which is as follows:

"Salem, Oregon, May 20, 1949

"Received of David Gerig and Ellen I. Gerig the sum of ($500.00) Five Hundred and no/100 Dollars, as Earnest Money on the following described property:

"Approximately 103 Acres and bldgs located ½ mile East of Parkersville School. Purchase price $21,500. Terms: ½ down payment in Cash, balance to be arranged on loan.

"Title Insurance to said property to be brought down to date, and furnished by owner 30 days to be allowed purchaser to examine Abstract.

"Sold Subject to Owner's Approval.

"If Title is not perfect, or cannot be perfected in a reasonable time, or owner does not approve this sale, the above mentioned Earnest Money will be returned to the purchaser.

"Time is the essence of this agreement, and upon the failure of the purchaser to comply with the terms hereof, at the time herein specified, all sums paid hereunder shall be forfeited to and be the property of Owners as consideration for this contract.

"Owner agrees to pay a 5 per cent commission on the sale price.

"LARSEN HOME & LOAN Co.
Agents.
"By Tom Higginbotham

"I agree to purchase the above described property on terms mentioned herein.

"David Gerig                     Purchaser
"Ellen I. Gerig                  Purchaser
"Phone 3-1569  Address R. # 6, Box, 425, Salem

"Approved and Confirmed G. A. Russ, Part Owner

"Approved and Confirmed Joe Russ, Owner

"P. J. Russ, Witness."

Later on, between June 23, 1949, and July 22, 1949, the purchasers paid to the broker various sums totaling $11,500 on the purchase price of the property, without the knowledge or consent of the sellers. No authorization was given by the sellers to the purchasers or the broker to make or receive such payments, unless it were contained in the documents hereinbefore quoted. No knowledge came to them of the payments until the filing of the complaint in the instant suit on April 14, 1951.

It appears that trouble was experienced over clearing title to the premises on account of certain estate proceedings, and some months after the above payments were made the purchasers took possession of the land and held the same up to and including the time of the filing of the lawsuit. During the course of their occupancy the record shows that they made certain valuable improvements on the property. It further appears that the purchasers and sellers were strangers to each other, excepting that the purchasers met one of the sellers while inspecting the property, and that all dealings regarding the sale of the land were handled by the broker.

On April 14, 1951, plaintiffs brought suit for specific performance of the contract, claiming that they had paid defendants a total of $12,000, and tendered the balance of $9,500 as owing on the contract. Defendants answered, denying the receipt of the $12,000, other than the $500 earnest money payment, and prayed for

specific performance against the plaintiffs upon payment of the balance of the purchase price of $21,000.

The trial court adopted the plaintiffs' theory of the case and directed specific performance of the contract on the part of defendants upon payment to them of the sum of $9,500.

It is the position of the purchasers that, first, the contracts in question expressly authorize the receipt of the payments by the broker, and second, in any event such authority would be implied from the language of the documents.

We can find no express authority conferred on the broker in the contracts alluded to, nor has any language supporting this theory been pointed out to us. The decision, therefore, turns on whether or not such implied authority may be gathered from them.

The general rule, reflecting the authority of a real estate broker, is well stated in 8 Am Jur 1016, Brokers, § 59:

> "* * * A real estate agent is generally a special agent of limited powers and is, therefore, in dealing with land, closely restricted within the terms of his agency. He must keep within the bounds of the authority conferred upon him; otherwise the principal will not be bound. Persons dealing with him are chargeable with notice of the limitation of his power."

In 8 Am Jur 1014, Brokers, § 56, the following rule is stated:

> "Since a broker is usually given only such authority as is commensurate with the duty of negotiating a deal, he is generally deemed to have no implied power to receive payment in behalf of his employer, and a debtor of the latter making such payment does so at the risk of having to pay again in case the broker defaults. * * *"

■ Again in 12 CJS 341, Brokers, § 135, we read:

"* * * in the absence of express or implied authority to receive payment, a payment to a broker employed to sell, or to negotiate the sale of property, which is never received by the principal does not in general constitute a payment to the latter, especially where the purchaser knows, or should know, that the broker is acting as such, or where the principal is known to the purchaser. This general rule that payment to the broker does not constitute payment to the principal, applies to a payment to a selling broker employed in connection with the sale of real property."

See *Flegel v. Dowling,* 54 Or 40, 102 P 178; *Lynn v. Northern Federal Sav. & Loan Ass'n,* 235 Minn 484, 51 NW2d 588, 30 ALR2d 799, and Annotation, 30 ALR2d 805.

It is asserted that because of the language employed in the listing contract, and particularly the following: "You are hereby authorized to accept a deposit on the purchase price, and, in my name, to execute a binding contract for the sale of said property," the broker had the authority to accept one-half of the down payment mentioned in the earnest money contract.

It is argued that where a broker has the authority to execute a binding contract in the name of the owner, this, under the law, gives the broker the authority to receive the money payable under such contract as incident thereto. The authorities are not in accord on this proposition and may be found collated in Annotation, 30 ALR2d 805, supra. As far as we are apprised, no Oregon case has been decided on this point. However, it will be unnecessary to lay down the law on this subject in the instant case because the broker did not enter into a contract for the sale of the property in the owners' names for the specified purchase price of

$23,500. The contract between the parties was the earnest money receipt contract and was signed by the broker subject to approval of, and later approved by, the sellers. This is the contract relied on in the pleadings in this case by both plaintiffs and defendants.

It is earnestly urged that "Terms: ½ Down payment in Cash, balance to be arranged on loan." mentioned in the earnest money contract, is the deposit that the broker was authorized to accept in the listing contract. This, in our opinion, is unwarranted since a deposit, in brokers' parlance, is universally understood to mean the money paid down to bind the bargain, that is, earnest money. A "deposit" is defined in Webster's New International Dictionary, 2nd ed, Unabridged, as "Anything given as a pledge or security, as earnest money or a forfeit." See *Sexton v. Berenson,* 186 Or 122, 205 P2d 146.

When the purchasers deposited $500 as earnest money with the broker and signed the earnest money contract, that was the deposit contemplated by the seller and broker when the listing contract was executed. Had the broker and purchasers entered into a binding contract in the sellers' names for the purchase price of $23,500, and a down payment been made on such contract, a different problem would have been presented. Since the earnest money payment of $500 was the deposit authorized by the listing contract, that was the only deposit the sellers authorized the broker to receive.

There is nothing in the language itself, "Terms: ½ Down payment in Cash, balance to be arranged on loan, "implying the authority of the broker to receive such down payment. Having full knowledge that the broker was acting for the sellers, it was the duty of the

purchasers to make the payments direct to the sellers rather than to the broker, and, when they turned the money over to the broker they did so at their own risk. 8 Am Jur 1014, Brokers, § 56, supra.

The purchasers rely on *Schmidt v. Fitzsimmons,* 190 Or 415, 226 P2d 306. That case differs from the present one in that there the money in controversy was deposited in escrow with the broker in the presence of the seller as a consideration for the giving of possession of the premises to the purchaser.

The decree will be modified to the extent that plaintiffs shall pay to the clerk of the court the sum of $20,425, being $21,000 less $575, the balance of the commission earned by the broker.

The parties shall bear their own costs and disbursements.