Argued February 2, affirmed April 20, 1966

# WARD COOK, INC. *v.* DAVENPORT ET AL
413 P. 2d 387

*Frank D. Riebe,* Portland, argued the cause for appellant. With him on the brief were Leo Levenson and Rosenberg & Swire.

*Mark A. Hathaway,* Portland, argued the cause for respondents Paul C. Davenport and Camille C. Davenport. On the brief were Hathaway and Arnold.

*Jean P. Lowman,* Portland, argued the cause for respondents Alfred Rapp, Inc., and Alfred Rapp. With her on the brief were King, Miller, Anderson, Nash & Yerke and Norman J. Wiener.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, DENECKE and LUSK, Justices.

LUSK, J.

Plaintiff Ward Cook, Inc. (hereinafter referred to as Cook) is a corporation engaged, among other things, in the loan and mortgage business for making insured mortgage loans under the National Housing Act. Cook brought this suit for restitution of the sum of $11,746.11 deposited by it with defendant American Escrow, Inc., in connection with a real estate sale transaction in which the defendants Fuller and wife were sellers and the defendants Davenport and wife were buyers. These defendants will hereinafter be referred to as Fuller and Davenport. The other defendants against whom relief is sought are Hazel M. Altig, president and general manager of American Escrow, and Alfred Rapp, Inc., a real estate brokerage company, and Alfred Rapp, its owner. The court entered a decree granting Cook partial relief and Cook has appealed.

On June 17, 1963, Davenport and Fuller executed an earnest money agreement for the purchase and sale of certain described residential property in Clackamas County, Oregon, owned by Fuller. Davenport was only a nominal purchaser of the property. He was a joint adventurer with Alfred Rapp, Inc., and two others under a written agreement for the purchase and sale as investments of real estate, mortgages, etc. Fuller's property was not listed for sale with Rapp, and the latter, having learned from Fuller, who was also a real estate broker, that the property was for sale, secured Davenport's signature to the earnest money agreement and brought it to Fuller for his acceptance, all in pursuance of the purposes of the joint adventure.

The purchase price named was $13,000 and the agreement was subject to the buyer obtaining a Fed-

eral Housing Administration insured loan in the sum of $12,600. At Rapp's solicitation Cook agreed to lend the money to Davenport. Out of the proceeds of the loan it was understood that an existing mortgage against the property held by Securities Intermountain, Inc., and on which there was due $8,760.85, would be discharged, Fuller would receive the value of his equity and Cook's incidental costs would be paid. A trust deed (mortgage) from Davenport to Cook to secure the loan would then become a first lien against the property. Rapp had, on a number of previous occasions, obtained loans from Cook for his clients and had left standing instructions with Cook that all such loans should be closed at American Escrow. Accordingly, American Escrow was selected as the depositary for the exchange of documents and disbursement of funds. Cook applied for and received from FHA a commitment to insure the loan. Rapp deposited the earnest money agreement with American Escrow, and Fuller, as directed by Rapp, deposited with that company a warranty deed dated August 28, 1963, conveying the property to Davenport, accompanied by instructions reading:

> "You are authorized to deliver this deed to Davenport, when you are in a position to disburse to us the sum of monies as per agreements by and between the undersigned, Alfred Rapp, Inc. and Paul Davenport."

The letter was not signed by Rapp, but by Fuller and his wife. Apparently, at a later date, though the precise time does not appear, Fuller wrote to American Escrow:

> "When you have assured yourself that I will receive $2,800 on the Fuller-Davenport deal you are hereby authorized to close said deal and de-

liver the warranty deed. Do not deliver deed or close deal otherwise."

On August 29, 1963, Cook wrote a letter to American Escrow, the material parts of which follow:

"Enclosed are the following in connection with the Davenport escrow:

"1. Closing Statement in duplicate
"2. FHA Commitment, original and copy
"3. Copy of survey
"4. Original deed of trust
"5. Original deed of trust note

"We are looking to you to see that the deed from Walter R. Fuller and Anne G. Fuller is in order so that title will vest in the names of our borrowers, *subject only to the mortgage in favor of Ward Cook, Inc.* and the usual printed exceptions. We will require an ATA Mortgagee's Title Policy.

"Upon receiving the executed note, FHA Commitment and closing statement and a recheck on the recorded deed of trust we will forward to your office our check in the amount of $11,746.11 ($12,124.11 less the discount of $378.00–3%)." (Italics added.)

The documents referred to in this letter were received by American Escrow.

On September 17 American Escrow sent the deed of trust to Pacific Title Company, which was to insure the title to the property. Pacific rechecked the title to determine whether there were intervening liens, and had the mortgage recorded. Also on September 17 American Escrow delivered Fuller's warranty deed to Davenport, and Davenport's executed note to Cook. On September 19 Cook, having been advised by Pacific that the trust deed was recorded, issued and delivered to American Escrow its check payable to the latter for $11,746.11.

American Escrow thereafter made the following disbursements:

To Fuller, $2,800 for his equity;
To Rapp, $27.36 for his commission;[①]
To Securities Intermountain, $400 to cover delinquent monthly installments on its mortgage.

The balance of the money was embezzled by American Escrow.

By its decree the court awarded judgments in favor of Cook (1) against Fuller $3,200 ($2,800 representing payment of his equity, and $400, the amount paid to Securities Intermountain); (2) against Rapp, $27.36, the commission paid him; (3) against American Escrow $8,518.75, the amount of the embezzlement.

The judgment against Fuller was declared to be an equitable lien upon the real property involved. The decree further provided for cancellation of the warranty deed from Fuller to Davenport and the promissory note and trust deed from Davenport to Cook.

A cross appeal filed by Fuller (since deceased) has been abandoned, and the only defendants represented on the appeal are Rapp and Davenport.

Under theories presently to be stated, Cook asserts its right to a judgment against Davenport and Rapp for $11,746.11, the full amount paid by it to American Escrow, and, in addition, $109.30, charges incurred by Cook in connection with the loan, or a total of $11,855.41; and a judgment against Fuller for $8,518.75.

The question of the liability of Davenport and Rapp requires a further statement of facts. The loan insured by FHA was equal to 97 per cent of the appraised value of the property. FHA regulations re-

---

[①] It appears that Rapp accepted a reduction from the normal commission in order to allow Fuller a larger sum for his equity.

quire that, in order to obtain a loan in such an amount, it is necessary that the borrower certify on the application for an insurance commitment that he intends to occupy the property, otherwise only 85 per cent of the 97 per cent is insurable. Davenport so certified. The representation was false, because, as previously explained, the Fuller property was purchased by the joint adventure as a speculation, and Davenport, on August 20, 1963, entered into an agreement, procured by Rapp as his agent, to sell the property to the defendants Meyer and wife. (The Meyers defaulted, but no relief was taken against them.)

■■ Cook asserts that Davenport's misrepresentation to FHA was relied upon by Cook in making the loan and for that reason Cook is entitled to rescind the transaction and to a judgment of restitution against both Davenport and Rapp, who was a party to the misrepresentation. But a fraudulent representation, in order to be actionable, must be the proximate cause of the injured party's loss: *Musgrave et ux v. Lucas et ux,* 193 Or 401, 410, 238 P2d 780. Although FHA had given its commitment to Cook to insure the loan, actual providing of the insurance was contingent upon payment of the Securities Intermountain mortgage and the Davenport trust deed becoming a first lien on the property. Embezzlement of the money by American Escrow frustrated this plan and, regardless of Davenport's misrepresentation, Cook could never have obtained FHA insurance. Or, to put the matter differently, even though there had been no misrepresentation by Davenport, the loss would have occurred just the same. Thus, it is clear that the loss resulted from the embezzlement and not from the reprehensible conduct of Davenport and Rapp.

The contention as to Fuller's liability is based upon

the following theory: The money paid into the depositary by Cook became Fuller's money because all the conditions of the escrow had been fulfilled—the Fuller deed had been delivered to Davenport, the Davenport note and trust deed had been delivered to Cook and the payment of the money to American Escrow according to the agreement was in legal effect payment to Fuller. Since, to the extent of more than $8,000, it was not applied to the purpose for which it was received, that is, to pay off Securities Intermountain first mortgage, Davenport had a right of action against Fuller for breach of the covenant of warranty in the latter's deed, and Cook is subrogated to Davenport's right.

■ When the dispute is between the buyer and seller of land the loss sustained as the result of the defalcation by an escrow holder of money deposited with it must be borne by the person who was the owner of the money at the time it was embezzled: *Schmidt et ux v. Fitzsimmons et ux,* 190 Or 415, 420, 226 P2d 304. Otherwise stated, the loss must fall upon the person whose agent the escrow holder was at that time: *Lieb v. Webster,* 30 Wash 2d 43, 190 P2d 701. In that case and in *Angell v. Ingram,* 35 Wash 2d 582, 213 P2d 944, 15 ALR2d 865, and several other cases reviewed in the Annotation, 15 ALR 2d 870, it was held that where all the conditions of the escrow had not been fulfilled at the time of the embezzlement or default of the escrow holder the loss fell upon the buyer. When all such conditions have been fulfilled the seller must bear the loss: *Lechner v. Halling,* 35 Wash 2d 903, 216 P2d 179; *Cradock v. Cooper,* Fla, 123 S2d 256.

This case is different from any cited by the parties or that we have been able to find in that in addition

to a buyer and seller of property, a lender of money was a party to the escrow. We assume, however, that the basic principles above stated apply. Cook's instructions to American Escrow in its letter of August 29, 1963, read in part:

"We are looking to you to see that the deed from Walter R. Fuller and Anne G. Fuller is in order so that title will vest in the names of our borrowers, subject only to the mortgage in favor of Ward Cook, Inc. and the usual printed exceptions."

Thus, contrary to the usual practice,[2] Cook was not to remit the money to American Escrow until after it had received Davenport's promissory note and recorded trust deed. Cook did, however, remit the funds after recording of the instruments and receipt of the Davenport note. The exact date of the embezzlement is uncertain, but, whatever it may have been, the money in the hands of American Escrow at that time belonged either to Cook or Davenport, with the exception of the amount to which Fuller was entitled. It was money furnished by the lender Cook, for the borrower, Davenport. As the court explained in *Shreeves v. Pearson,* 194 Cal 699, 707, 230 P 448, prior to the performance of the terms of an escrow, the escrow holder is the agent of both parties, but "whenever the conditions attending the escrow have been so far performed that the transaction which has called the escrow into being becomes complete, the nature of this dual agency

---

[2] In describing the function of an escrow holder in carrying out his obligations it is said: "* * * it is as though the escrowee had crossed his hands, and the documents which he held in his right hand are delivered to the buyer, and the money which he held in his left hand is delivered to the seller": Home, Escrow and Land-Title Procedure 241. See, also, Lusk, Law of the Real Estate Business 223.

changes to an agency not for both, but for each of the parties to said transaction in respect to those things placed in escrow to which each has thus become completely entitled."

The only part of the money deposited by Cook to which Fuller became "completely entitled" was $2,800, which was remitted to him in accordance with his instructions. The balance, being money loaned to Davenport, and for which he had already given his promissory note, belonged either to Cook or Davenport. Apparently, Cook's instructions, above quoted, included authority of American Escrow to pay from the fund to Securities Intermountain a sufficient amount to satisfy its mortgage, but it would not be on that account any the less the money of Davenport.

Other circumstances, however, make inescapable the conclusion that the money was Cook's, or, at least, that Cook is precluded from contending to the contrary.

■ In its complaint in this case Cook demanded a judgment against American Escrow for the full amount of its remittance. No such judgment was recoverable by it unless the money embezzled belonged to Cook. It is probably true that merely to seek such a judgment along with other relief prayed for would not be sufficient to preclude Cook from claiming, alternatively, that the money was Fuller's. Perhaps, though this is not free from doubt, the fact that Cook not only demanded, but obtained a judgment against American Escrow may not be sufficient. But the matter does not rest there. At the oral argument we were informed by counsel for plaintiff that the United States National Bank of Oregon held money in a trustee's checking account of American Escrow and, be-

cause of numerous claims, the bank filed an inter-pleader action in the United States District Court for the District of Oregon in which all parties to the present suit were named as defendants. All such parties except Cook defaulted. The priority claims of attaching creditors were disallowed in that suit and the court entered a judgment determining that the funds on hand should be distributed pro rata to all appearing creditors. As a result of this judgment Cook received the sum of $1,690.65, out of which he paid his attorney a fee of $563. Counsel further stated that Cook would account for the net recovery in Federal Court to the party or parties in the case at bar who must suffer the ultimate loss. Without questioning counsel's good faith in the slightest, this disclaimer cannot be accepted as neutralizing the legal effect of Cook's action, for the reason, among others, that Cook has already, by paying its attorney out of the proceeds of the judgment in the Federal Court, treated the money as its own. This action is wholly inconsistent with the claim that it was Fuller's money which American Escrow embezzled and constitutes an irrevocable choice of a substantive right by which Cook is bound, 18 Am Jur 131-132, Election of Remedies, § 6.

■ Returning to Cook's claim of subrogation to the rights of Davenport, we express no opinion as to whether subrogation would lie were the facts as Cook contends, but since that claim is founded upon the erroneous view that it was Fuller's money which was embezzled, the claim cannot be sustained.

■ The final contention of Cook must, for a similar reason, be rejected. It is urged that the trial court erred in cancelling the note and trust deed. This might be so if Davenport had ever become entitled to the

money advanced by Cook. In view of our holding to the contrary, it follows that Davenport received no consideration for the note and trust deed and the instruments could, therefore, very properly be cancelled.

There are no other controverted issues and the decree is affirmed without costs or disbursements to any of the parties.