Argued October 29, affirmed December 16, 1970

FRIESEN ET UX, *Appellants, v.* FUITEN, *Respondent.*

478 P2d 372

*William B. Wyllie,* Salem, argued the cause for appellants. With him on the brief were Williams, Skopil, Miller, Beck & Wyllie, Salem.

*Thomas A. Huffman,* Hillsboro, argued the cause for respondent. With him on the brief were Huffman & Zenger, Hillsboro.

Before O'CONNELL, Chief Justice, and DENECKE, TONGUE and BRYSON, Justices.

BRYSON, J.

This is a suit in equity for specific performance of an oral contract. Plaintiffs appeal from an adverse decision.

Plaintiffs allege:

"(1) That on or about March 1, 1963, the plaintiffs had entered into an oral contract with the defendants providing that the defendants, as the present stockholders of Fuiten's Mortuary, Inc., an Oregon corporation, agreed to sell to the plaintiffs one-half the common stock of said corporation for the sum of $108,374. That $15,172.50 was to be paid as down payment, the balance to be paid in annual installments, to be paid from the plaintiffs' share of the profits owing to the

plaintiffs for the performance of labor and management of the mortuaries.

"(2) That the plaintiffs had performed all the covenants and conditions of the contract on their part, including payment of the down payment of $15,172.50 and the performance of labor and management services."

They further allege that their share of the profits paid the balance of the purchase price and that they had no remedy at law and prayed for the court to transfer to them by decree one-half of the corporate shares. Defendant James Fuiten denies the complaint in its entirety, and defendant Ida Fuiten denies that she participated in any agreement for plaintiffs to purchase stock in Fuiten Mortuary, Inc., and that, if there was an oral agreement to purchase, the same was with James Fuiten only.

A review of the evidence discloses the following:

In 1959 the defendants each owned one-half of the corporate shares of Fuiten Mortuary, Inc., located in Forest Grove, Oregon. James Fuiten was the licensed mortician and funeral director, and Ida Fuiten, his wife, assisted in the enterprise. She had invested considerable money of her own to establish this business. Plaintiff Robert Friesen of Dallas, Oregon, had graduated from mortuary college and was employed by Fuiten Mortuary, Inc., to complete his funeral director's apprenticeship. His wife, the other plaintiff, went with him to Forest Grove and assisted. This type of business, particularly in a smaller city, seems to require the joint efforts of a husband-and-wife team, the wife answering the telephone, greeting members of the deceased's family and taking care of routine matters while the husband

is away from the place of business making calls and other arrangements.

By the fall of 1960 plaintiff Robert Friesen had completed his apprenticeship and become a licensed funeral director. He expressed a desire to return to his home community of Dallas, Oregon, to establish his own mortuary. James Fuiten, in an effort to retain his services, offered him a proposal to purchase 49 per cent of the common shares of Fuiten Mortuary, Inc., which he declined. The plaintiffs returned to Dallas, Oregon. Mr. Friesen and members of his family (all long-time residents of Dallas) organized Friesen Mortuary, Inc., and Mr. Friesen constructed and operated the mortuary, again with his wife assisting. The mortuary in Dallas did not prosper and incurred considerable indebtedness.

The two men continued their acquaintance, and in October, 1962, the defendants, while in Dallas, made a social call on the plaintiffs. James Fuiten urged Robert Friesen to move to Hillsboro, Oregon, to operate a mortuary owned by Fuiten Mortuary, Inc. Fuiten Mortuary, Inc., eventually operated mortuaries of varying profitability in Forest Grove, Hillsboro, Vernonia and Beaverton, Oregon.

Mr. Friesen contends that he told Mr. Fuiten he would not move unless plaintiffs could acquire a one-half ownership in Fuiten Mortuary, Inc. Mr. Fuiten contends that he agreed to try to work out a means by which Mr. Friesen could purchase up to 49 per cent of the common shares, the same as he had offered in 1959. In March, 1963, the plaintiffs moved to Hillsboro, and Robert Friesen was employed by Fuiten Mortuary, Inc. Other steps were taken which showed that Robert Friesen was to become interested

in Fuiten Mortuary, Inc., including the change of the corporate name to Fuiten-Friesen Mortuary, Inc.

From this point on, the facts are largely in dispute. The negotiating and conversation relative to a contract took place between Robert Friesen and James Fuiten. In order to expedite the plaintiffs' moving to Hillsboro, Fuiten Mortuary, Inc., through Mr. Fuiten, agreed to and did purchase the assets of Friesen Mortuary, Inc., in Dallas and assumed its liabilities, which included loans made to the corporation by members of the Friesen family in the amount of some $51,000. The interest of Robert Friesen in the Friesen Mortuary, Inc., of Dallas amounted to $15,246.46 (a 25-per cent interest in the Friesen Mortuary, Inc.), and this sum was credited on the books of Fuiten Mortuary, Inc., for the purchase of common stock by plaintiffs in Fuiten Mortuary, Inc. Robert Friesen subsequently withdrew some $11,000 of the $15,246.46 and $2,000 as interest on this amount. The Friesen Mortuary, Inc., of Dallas was subsequently sold with the consent of Mr. Friesen, and no profit was realized.

Mr. Friesen contends that the oral contract called for the balance of his stock purchase in Fuiten Mortuary, Inc., to be paid by the difference between the salary he drew and the salary drawn by Mr. Fuiten. As to the purchase price of the stock, Robert Friesen testified as follows:

"Q All right. Was there at this time any conversation or discussion as to what the purchase price would be for the half interest in the stock?

"A Yeah. This is that hundred or $108,000 that we had talked about, which woulda been the book value at that time.

"Q And was there any conversation with reference to the length of time that it was going to take to pay it off, what the payments would be?

"A Yes. I believe I stated that twenty years or less."

In February of 1964 Mr. Friesen and Mr. Fuiten met in the office of an attorney along with Mr. Fordham, accountant for the corporation, to discuss terms of a proposed contract by which the Friesens would purchase one-half of the corporate stock owned by the Fuitens. The plan contemplated, first, the purchase of 25 per cent of the stock and, later, another 25 per cent of the stock as he was financially able to handle it, the purchase price of one-half of the stock to be $108,000 at $10 per share. While the wives might have known of some of these negotiations, they did not participate.

A proposed written agreement was prepared by the attorney, and a meeting was held in August, 1964, which was attended by the plaintiffs and defendants, the attorney and the accountant. The evidence shows there was no meeting of minds on the contents of the written proposal, no one signed the proposed contract (which was introduced in evidence) and Mrs. Friesen said, "I'm not signing it. I'm not going along with this deal." A letter of accountant Fordham, received in evidence, stated the "corporation did not make enough profit to permit Friesen to purchase fifty per cent of the stock out of the corporation profits." Mr. Friesen indicated that he expected to be in business with Mr. Fuiten and that they would each own 50 per cent of the stock. An exhibit received in evidence indicated Mr. Friesen's net worth in the corporation or corporations was ap-

proximately $21,000. No tender of the balance of the purchase price of the stock was made by the plaintiffs. These are the pertinent facts from a lengthy trial.

Plaintiffs filed this suit in 1968, and Mr. Friesen's employment with Fuiten-Friesen Mortuary, Inc., was terminated.

There was no request for special findings of fact, and the trial court found generally that the plaintiffs were not entitled to specific performance of the contract.

The sole question before this court is whether or not plaintiffs are entitled to specific performance of the alleged contract with defendants for conveyance of one-half of the stock in Fuiten Mortuary, Inc.

At the time of trial Mr. and Mrs. Fuiten were divorced, and Mrs. Fuiten had sold her 50 per cent of the stock to a third person. The plaintiffs in their brief to this court state: "The plaintiffs did concede at the conclusion of the testimony that there was insufficient evidence to sustain their demand for relief against the defendant Ida Fuiten. A decree for both defendants was entered by the Court * * *." This court, on motion of Ida Fuiten, with no objections by plaintiffs, ordered the dismissal of the appeal as to Ida Fuiten.

■ This court has on numerous occasions in equity suits enunciated the rule that while the findings of the trial court are not binding, they are persuasive and are entitled to great weight. *Reeves et ux v. Dickenson et ux*, 208 Or 360, 300 P2d 458 (1956); *In re Wakefield's Estate*, 161 Or 330, 87 P2d 794, 89 P2d 592 (1931).

The dialogue of the trial court with plaintiff Robert Friesen at the conclusion of his testimony is revealing.

"THE COURT: Why did you draw $1500 out of this corporation?

"THE WITNESS: That was when my son was going to his first year in college and I needed that amount of money for his tuition down in Texas.

"THE COURT: And what—from what source did you think it was coming?

"THE WITNESS: My indication in all this time was that I was accumulating an interest into the business and that, beings that I had never received a statement that I was in arrears, I felt that we were building up a surplus. And, when I—I always asked Mr. Fuiten before I'd write out any checks, while I was signing the records, and he said there was no problem and, to my knowledge, it was not designated at that time. I just said I needed the money; he said, 'Fine.' I told him how much, and he said, 'All right.'

"THE COURT: Did you testify earlier that these accumulations were to be paid over to the Fuitens who owned this stock that you were to be purchasing?

"THE WITNESS: The stock purchase, yes.

"THE COURT: Okay. Now, if these accumulations were to be paid over by the corporation to the Fuitens, how would there be any balance for you to draw on?

"THE WITNESS: If the—I don't—not quite sure I understand your question.

"THE COURT: As I understand your earlier testimony, you told the Court that the difference between your salaries, an amount equal to whatever Mr. Fuiten drew as bonus and half the profits

were to be accumulated in your name and paid over to the Fuitens in payment of the stock you were to purchase.

"THE WITNESS: Yes.

"THE COURT: Now, if this was, in fact, done, how would there be anything left for you to draw out?

"THE WITNESS: I don't—don't—didn't mean to imply that this, in fact, was done to the Fuitens, but all of this was accumulating because, of course, I had never even received any stock.

"THE COURT: Okay, to their—to their credit?

"THE WITNESS: Pardon?

"THE COURT: Was it being accumulated to their credit or to yours?

"THE WITNESS: Well, to mine, then to apply to the purchase of the stock.

"THE COURT: Well, if it was to apply to the purchase of the stock, how could you draw it out?

"THE WITNESS: I really don't know how."

■ The trial court did not err in entering a decree in favor of both defendants.

There was some loose agreement between Mr. Friesen and Mr. Fuiten to buy and sell stock in Fuiten Mortuary, Inc., but it never crystallized. Mrs. Fuiten owned 50 per cent of the stock, and she did not agree to anything.

In a similar case, a suit on an oral contract for specific performance, this court held: "A meeting of minds upon each and all essential elements is indispensable to creation of a contractual relationship." *Kretz v. Howard*, 220 Or 73, 346 P2d 93 (1960),

citing *Reed v. Montgomery,* 180 Or 196, 175 P2d 986 (1947), which stated: "Before there can be a valid contract the parties must have a distinct intention common to both and without doubt or differences, so that there is a meeting of minds as to all terms, and if any portion of the proposed terms is not settled or no mode is agreed on by which it may be settled, there is no agreement."

■ An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain. Restatement, Contracts § 32.

One of the tests for ordering specific performance of an oral contract is that the proof must be clear, unequivocal and by a preponderance of the evidence. *Benson v. Williams,* 174 Or 404, 143 P2d 477 (1944); *LeVee v. LeVee,* 93 Or 370, 377, 183 P 773 (1919). The plaintiffs' proof does not meet this requirement.

In the plaintiffs' opening brief the only question presented on appeal is as follows:

"Are the plaintiffs, who conveyed their Dallas corporation to the defendants, moved their family to Hillsboro, managed the defendants' mortuaries, and accepted a lesser monthly draw in exchange for a promise to sell one-half the stock in Fuiten Mortuary, Inc., entitled to specific performance of that contract with the defendants for conveyance of one-half of the stock in Fuiten Mortuary, Inc."

Without explanation they affirmatively urge new theories of recovery in the reply brief, such as a partnership agreement has been consummated, or that recovery in quantum meruit is an alternative remedy to specific performance. The complaint and

prayer are silent on these matters, and the testimony before the trial court shows no indication that alternative methods of recovery were submitted to the trial judge.

■ It is well settled that when a cause has been heard upon a certain theory in the trial court, with the acquiescence of the parties litigent, it must be so continued on appeal. The doctrine that the parties to an appeal are restricted to the theory upon which the cause was prosecuted or defended in the court below is a well-established general rule of law, *MacVeagh v. Multnomah County,* 126 Or 417, 270 P 502 (1928)—except where important considerations of public policy are encountered in the solution of a case before the court. *Agan et al v. U. S. National Bank,* 227 Or 619, 629, 363 P2d 765 (1961).

■ For this reason the court will not consider the new theories on appeal, but this is not to say that the plaintiffs can or cannot pursue the same further as to defendant James Fuiten.

The decree of the trial court is affirmed.