Argued December 4, 1974, affirmed in part; reversed in part;
remanded May 1, 1975

BRUCKMAN, *Respondent, Cross-Appellant, v.*
BREITENBUSH HOT SPRINGS, INC. ET AL,
*Respondents,* HOGLE ET UX, *Cross-Appellants,*
KING, *Intervenor-Respondent.*

JOHNSTON ET AL, *Respondents, v.*
BREITENBUSH HOT SPRINGS, INC. ET AL,
*Respondents,* JOHNSON PROPERTIES ET AL,
*Appellants,* KING, *Intervenor-Respondent.*
534 P2d 971

*Norman K. Winslow,* Salem, argued the cause and filed briefs for appellants Johnson Properties and LaFarlette.

*J. Ray Rhoten* of Rhoten, Rhoten & Speerstra, Salem, argued the cause and filed a brief for respondent Johnston Construction Co.

*John A. Bryan* of DeArmond, Sherman & Barber, Salem, argued the cause and filed a brief for respondent-cross appellant Bruckman.

*Don H. Marmaduke,* Portland, argued the cause and filed a brief for respondents-cross appellants Hogle.

Before McALLISTER, Presiding Justice, and HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

BRYSON, J.

This is an appeal on a consolidation of two suits, a mortgage foreclosure and a mechanic's lien foreclosure. Several defendants filed counterclaims, and various parties appeal from the trial court's consolidated decree.

The real property involved is located in Marion County, Oregon, and is divided into the North Parcel and the South Parcel by a Forest Service road. All of the improvements and resort facilities are on the South Parcel. The North Parcel is bare land.

Plaintiff Bruckman filed circuit court case No. 72415, alleging two causes of suit to foreclose on two separate purchase price mortgages given to secure two separate notes executed by separate parties. The first cause of suit alleges a $120,000 note and a mortgage executed by defendant Breitenbush Hot Springs, Inc., covering property herein referred to as the South Parcel. The second cause of suit alleges a $15,000 note and a mortgage executed by Wilma and Carl Hogle, Don and Mary Ann Hubbard, Floyd and Raye La-Farlette, Fritz and Ruth Jahnke, and U. James and Agnes Phillips covering property herein referred to as the North Parcel.

Plaintiff Johnston Construction Co., hereinafter Construction Co., filed circuit court case No. 71998 to foreclose a mechanic's lien in the amount of $41,-556.70 for material and labor expended on the Breitenbush lodge and facilities situated on the South Parcel, as described in the first cause of suit of the Bruckman foreclosure suit. Numerous other contractors, materialmen, second and third mortgagees, and parties claiming a lien or interest in the South Parcel were made parties defendant. Some of these parties filed countersuits.

*BRUCKMAN, CROSS-APPELLANT, APPEAL*

Mr. Bruckman appeals from that part of the court's consolidated decree which disposed of his second cause of suit for foreclosure on the North Parcel.

During trial the defendants Wilma Hogle and Carl Hogle, on behalf of the defendants who executed the note and purchase price mortgage in favor of

Bruckman, covering the North Parcel, tendered into court the sum of $19,718.75, itemized as follows:

> "Principal                   $15,000.00
> Interest at 7% from
>   1-1-70 to 4-3-73           3,421.25
> Title report                  47.50
> Attorney's fees           1,250.00
>                          $19,718.75"

The court accepted the tender and ordered that plaintiff Bruckman execute a satisfaction of the mortgage on the North Parcel and dismissed the mortgage foreclosure set forth in plaintiff Bruckman's second cause of suit. Bruckman appeals from this portion of the consolidated decree.

The facts leading up to the execution of the two separate notes and purchase price mortgages covering the North and South Parcels are somewhat complicated. For many years Mr. Bruckman had owned all of the northeast quarter of a section of land which is divided into the North and South Parcels by a Forest Service road running generally east and west. The Breitenbush Hot Springs are located on the South Parcel, the larger of the two parcels. He desired to sell all of the land with the exception of a 6-acre parcel. He negotiated a sale of the land with U. James and Kent J. Phillips. However, exhibits in evidence show that each parcel, North and South, was dealt with by separate options, earnest money agreements, and sales agreements. Mr. Bruckman contends and so testified that it was at his insistence that the "instruments be 'tied' together to prevent the separate foreclosure of the parcles [sic]."

The sales contracts on the North and South Parcels each contained the following so-called "tie-in clause":

> "This Sale Agreement is being executed simultaneously with another Sale Agreement affecting

property located North [South] of the property herein described, and any default in any of the terms of this agreement will constitute default under the terms of both Sale Agreements and will give rise to the utilization of any of the remedies herein set forth and contained for the first parties."

These contracts, originally with U. James and Kent J. Phillips as purchasers, were assigned with the consent of Bruckman. The contract on the South Parcel was assigned to defendant Breitenbush Hot Springs, Inc., hereinafter Breitenbush. The contract to purchase the North Parcel was assigned to Hogle and others, and some of these assignees had no interest in Breitenbush. The sales contracts also provided that when one-half of the purchase·price was paid, the vendor, Bruckman, would convey the property by warranty deed to the vendee and accept the vendee's note for the balance of the purchase price, secured by a mortgage on the property. Both Breitenbush and Hogle and others paid one-half of the purchase price and Bruckman conveyed title to each vendee on the North and South Parcels and accepted notes covering the purchase price balance, secured by a mortgage. It is these two mortgages covering the North and South Parcels that the suit seeks to foreclose.

When Breitenbush was organized it made a public offering of its corporate shares. The Oregon Corporation Commissioner required that the "tie-in clause" be removed from the mortgage on the South Parcel before being executed by Breitenbush. Bruckman agreed to this and accepted the mortgage on the South Parcel with no "tie-in clause." The mortgage covering the North Parcel provided that any default in the Breitenbush mortgage on the South Parcel would constitute a default even though the debt secured by the mortgage on the North Parcel had been paid.

Bruckman argues that by the court's decree

"Hogle has therefore been unjustly enriched * * * at the expense of Bruckman who is entitled to look to the whole of the property as security for the balance of the whole purchase price. Hogle and others have acquired the legal title to the North Property by questionable means, contrary to the contract with Bruckman * * * and a constructive trust should be declared by operation of law in favor of Bruckman. Marston v. Myers, 217 Or 498, 432 [342] P2d IIII [1111]."

■ It should be pointed out that Bruckman's desire to not separate the South and North Parcels, which was accomplished by a tie-in clause in each sales agreement, was extinguished when he consented to the requirements of the Corporation Commissioner and accepted a mortgage from Breitenbush with no tie-in clause. Obviously if Breitenbush or its successors paid the mortgage on the South Parcel, Bruckman would have to satisfy that mortgage. If there was a subsequent default on the mortgage on the North Parcel, he could have foreclosed on the same and perhaps bid his judgment in at the sheriff's sale but he could not prevent the separation of the South Parcel from the North Parcel.

■ Defendants Hogle contend that plaintiff's complaint merely alleged a foreclosure on the mortgage; that it contained no allegation of unjust enrichment and contained no contention of a constructive trust, and that "[h]aving been neither pleaded nor tried in the court below, Bruckman's argument on appeal in reference to the North property should not warrant appellate consideration." This contention is correct. There are no such allegations in plaintiff's complaint or reply. In *Friesen v. Fuiten,* 257 Or 221, 231, 478 P2d 372 (1970), we stated:

"It is well settled that when a cause has been heard upon a certain theory in the trial court, with

the acquiescence of the parties litigant, it must be so continued on appeal. The doctrine that the parties to an appeal are restricted to the theory upon which the cause was prosecuted or defended in the court below is a well-established general rule of law, *MacVeagh v. Multnomah County,* 126 Or 417, 270 P 502 (1928)—except where important considerations of public policy are encountered in the solution of a case before the court. *Agan et al v. U. S. National Bank,* 227 Or 619, 629, 363 P2d 765 (1961)."

Plaintiff relies solely on *Marston v. Myers et ux,* 217 Or 498, 342 P2d 1111 (1959). We find no similarity between the facts in *Marston* and the case at bar. In *Marston* the plaintiff claimed that her brother, the defendant, obtained title to property from her by virtue of a confidential relationship which he breached and thus he should be held to be the trustee of the premises for her benefit on the theory a constructive trust arose by operation of law. We find no such contention in the pleadings in the case at bar, and the facts do not reveal a confidential relationship or support any theory that would give rise to a constructive trust.

Carl and Wilma Hogle, defendants, cross-appeal from that part of the consolidated decree that awarded Bruckman attorney fees on the foreclosure and disallowed Hogles' request for attorney fees. The trial court awarded Bruckman $1,250 as attorney fees on the second cause of suit, one-half of the amount prayed for in his complaint to foreclose on the North Parcel.

Hogles contend that they are the prevailing parties within the meaning of ORS 20.096. The mortgage on the North Parcel, on which Bruckman brought foreclosure, as well as the note which the mortgage secured, provided for payment of reasonable attorney fees in the event of suit being instituted to foreclose the mortgage.

The second cause of suit to foreclose the mortgage on the North Parcel alleged that the Breitenbush mortgage on the South Parcel was in default[①] and that therefore the mortgage on the North Parcel was in default and prayed for foreclosure and sale of both the North and South Parcels as one parcel of land.

■ It is true that the court did not order the sale of both parcels of land and allowed the Hogles to tender into court the total amount due on the North Parcel mortgage and note. However, the court did order that defendants Hogle and others pay to the plaintiff the $15,000 principal balance due and owed by them on the mortgage together with interest, title report and attorney fees as alleged and prayed for in plaintiff's second cause of suit. Under the circumstances of this case, we find that plaintiff Bruckman was the prevailing party within the meaning of ORS 20.096 and was entitled to attorney fees as ordered by the court. We find no error in this respect. *Equitable Life Assur. Soc. v. Boothe,* 160 Or 679, 684, 86 P2d 960 (1939).

### BRUCKMAN'S APPEAL AS TO JOHNSTON CONSTRUCTION CO., CASE NO. 71998

■ Bruckman contends that the trial court erred in granting the labor portion of Johnston Construction Co.'s mechanic's lien priority over his prior recorded first mortgage on the South Parcel improvements. This is the same position taken by appellants Johnson Properties and Floyd and Raye LaFarlette, holders of alleged second and third mortgages on the South Parcel. The Bruckman mortgage was recorded January 15, 1970, and the Johnson and LaFarlette mortgages were recorded January 21, 1970. The plaintiff Construction Co. did not commence work on the South

---

[①] The Breitenbush corporation was insolvent and the consolidated decree ordered foreclosure of the mortgage on the South Parcel.

Parcel, Breitenbush property, until May 11, 1970. Bruckman argues that the major work performed by Johnston Construction Co. was the remodeling, alteration and repair of existing improvements rather than the construction of *new* improvements. We agree.

At trial, James Johnston testified:

"Q Mr. Johnston, how much of this project was alteration and repair and how much was new construction?

"A That is a little difficult to say. I would say half and half maybe.

"\* \* \* \* \*.

"Q So the main part of your job was actually remodeling this lodge, there was some other work done?

"A Yes.

"\* \* \* \* \*.

"Q The only new building that you erected there was the concession stand, was it?

"A Yes."

Johnston Construction Co.'s foreman on the project testified that the concession stand was the only structure or improvement that could be removed without damage.

In *Otness v. Ore. Livestock Cooperative,* 209 Or 513, 517, 307 P2d 320 (1957), we reaffirmed our previous decisions in *Bratzel v. Stafford,* 140 Or 661, 14 P2d 454, 16 P2d 991 (1932), and *Residential Finance Co. v. Larkin,* 149 Or 410, 40 P2d 1008 (1935), and held:

"The provisions of subsection (2) of ORS 87.025 are dispositive of the priority issue. In construing the subsection, it has long been held by this court that a mechanic's lien for material and labor furnished in the *alteration or repair* of a building, commenced and made subsequent to the date of

record of a duly executed mortgage on the building and land, does not take precedence over the mortgage. [Citing cases.]." 209 Or at 517. (Emphasis added.)

It is clear from the testimony received from James Johnston that the "main part" of his work was "actually remodelling this lodge" and that the "only new building * * * was the concession stand." The stand was removable.

We conclude the trial court erred when it awarded Johnston Construction Co. first priority on the improvements for the *entire* amount of Johnston Construction Co.'s mechanic's lien claim for labor. Oregon State Bar C.L.E., Foreclosing Security Interests, Mechanics' Liens §§ 5.36, 5.39 and 5.40 (1971).

## *BRUCKMAN'S APPEAL AS TO RECEIVER ARMSTRONG*

■ Bruckman contends that he should not be liable for the receiver's compensation and expenses because he had "no part" in, and objected to, the appointment of Carl Armstrong as receiver.

After Bruckman had been served with the trial court's order to appear and show cause why a receiver should not be appointed for Breitenbush, the trial court entered the following order:

"IT APPEARING TO THE COURT that substantially all of the parties to the above litigation have been notified of said application of Lewis L. King, that an Order to Show Cause has been served upon them, that no one has appeared in opposition to said application, and that a number of parties have affirmatively filed Answers herein approving the appointment of such a liquidating receiver, and that other parties, through counsel, have indicated that such appointment is desirable and in the interests of all of the parties; and

"IT IS THEREFORE HEREBY ORDERED

AND ADJUDGED that CARL P. ARMSTRONG be, and he is hereby appointed liquidating receiver of Breitenbush Hot Springs, Inc. pursuant to the proceedings herein, * * *."

Subsequently, Bruckman filed an affidavit which acknowledged this appointment.

Although Bruckman did not initiate the appointment of Carl Armstrong as receiver, he obviously did not object to the appointment. In fact, as we read the record, Bruckman consented to the appointment of Carl Armstrong as receiver. For these reasons we find no error in this respect.

## APPEAL OF JOHNSON PROPERTIES AND LaFARLETTE

Johnson Properties and the LaFarlettes are second and third mortgagees on the South Parcel and appeal from that portion of the trial court's consolidated decree that invalidated their respective mortgages.

In November of 1969 Breitenbush lacked sufficient funds to meet its obligations and for the purchase of the South Parcel. As a result, Breitenbush "borrowed" $30,000 from Clinton and Eva Johnson[9] and $15,000 from Floyd and Raye LaFarlette. On December 22, 1969, Johnsons' $30,000 and $10,000 of LaFarlettes' money was deposited *in a special stock sales account* which had been established by order of the Oregon Corporation Commissioner. These payments enabled Breitenbush to obtain an order from the Corporation Commissioner releasing, as of January 6, 1970, the funds held in escrow (approximately $76,000). These funds were then used to meet the $60,000 installment payment due to Bruckman for the purchase of the South Parcel and for other corporate obligations.

[9] Johnson Properties, a California corporation, succeeded to Clinton and Eva Johnson's interest.

Because Breitenbush did not hold legal title to the South Parcel in December of 1969, it was agreed that Breitenbush would "temporarily secure" its promissory notes to the Johnsons and the LaFarlettes with its own stock. Upon receiving title,[3] Breitenbush was to execute second and third mortgages as "permanent security" for the respective "loans."

In contrast to the testimony at trial, the corporate records are vague and incomplete; the transactions in question are not accurately explained or reflected in the records. On December 19, 1969, subscription agreements were executed for 30,000 corporate shares to Ruth Baker and for 10,000 shares to LaFarlettes. On January 21, 1970, Breitenbush executed its promissory notes to the Johnsons and the LaFarlettes for $30,000 and $15,000 respectively. A week later, on January 28, 1970, certificates representing 45,000 shares of stock were issued, 30,000 shares to Floyd and Ruth Baker and 15,000 shares to Floyd and Raye LaFarlette.[4] On February 10, 1970, approximately two weeks later, second and third mortgages were executed to secure the aforementioned promissory notes. Sometime thereafter the stock certificates were returned.[5]

---

[3] The parties stipulated that Breitenbush obtained legal title to the South Parcel on January 15, 1970.

[4] As California residents, Clinton and Eva Johnson could not purchase stock in Breitenbush, an Oregon corporation. Therefore, according to the testimony, Ruth Baker (Clinton Johnson's sister), acted as trustee or agent for the Johnsons. However, the stock certificate for 30,000 shares is issued in the name of Ruth Baker and her husband as joint tenants. Ruth Baker did hold 100 shares as "Trustee" for her brother, but this arose out of a separate transaction.

Ruth Baker was the realtor who handled the original sale of the North and South Parcels. In mid-January 1970 Ruth Baker became a member of the Board and was elected president of Breitenbush. Floyd LaFarlette was also a member of the Board at the time.

[5] According to exhibits received, the 15,000 shares issued to

The trial court found "that the LaFarlette and Johnson Properties mortgages were invalid and that this money was, at least for all third parties benefits, obviously a stock purchase and to hold otherwise would give them an unlawful preference."

We find it unnecessary to discuss several contentions set forth by the parties because an examination of the record clearly indicates that the mortgages were invalid.

First, between December of 1969 and January of 1970 the transactions were treated as stock sales, at least for the purpose of releasing the funds held in a special stock sales account by order of the Corporation Commissioner. Second, the stock was to serve as *"temporary* security" until Breitenbush obtained title to the South Parcel. (Emphasis added.)

Despite the voluminous testimony that the transactions were merely temporary expedients, we are unable to understand why certificates for shares were issued as *"temporary* security" on January 28, 1970, *13 days after Breitenbush received title to the South Parcel.* (Emphasis added.) It is clear that Breitenbush could have executed the mortgages, assuming they were authorized to do so by the Corporation Commissioner, on and after January 15, 1970. In essence, the issuance of certificates for shares as a form of "security" or "collateral" was a needless act if the original intent was to issue notes secured by second and third mortgages.

the LaFarlettes were returned and cancelled sometime before August 20, 1970. Mrs. LaFarlette testified that the stock was returned in June of 1971. The 30,000 shares issued to the Bakers were returned, but not cancelled, in February of 1971. There was no formal record of these transactions. Other than an undated, handwritten entry on one of the stock certificate stubs which states, "Cancelled—to retain mortgage," there is nothing to indicate that the total amount of stock issued was to be "temporary security" for "loans."

Furthermore, the record does not indicate why the certificates were not returned and cancelled simultaneously with the subsequent execution and delivery of the mortgages. The record also shows that the Johnsons and the LaFarlettes retained possession of their respective stock certificates and mortgages until they were informed some months later that they had an "election" to keep one or the other, but not both.

■■ The conduct of the parties toward the stock certificates and mortgages is totally inconsistent with the contentions raised at trial and on appeal. Conduct inconsistent with a declared agreement is a significant, and sometimes controlling, factor. *Jenkins v. AAA Heating,* 245 Or 382, 385, 421 P2d 971 (1966); *Wallowa Valley Stages v. Oregonian,* 235 Or 594, 597, 386 P2d 430 (1963). Under the facts and circumstances of this case, we conclude, as did the trial court, that the cash advances of the Johnsons and the LaFarlettes were stock purchases and not loans.[©]

■ It follows that there is neither a debt nor an obligation for the mortgages in question to secure. Thus, the mortgages are invalid, *see Ward Cook, Inc. v. Davenport,* 243 Or 301, 312, 413 P2d 387 (1966); Osborne, The Law of Mortgages § 103, nn. 11-13, § 109 (2d ed 1970); 55 Am Jur 2d, Mortgages § 133 (1971), and subject to challenge by mechanic lienors whose interests in the subject property are adversely affected by the mortgages. 59 CJS Mortgages § 146. The trial court did not err in this respect.

This conclusion disposes of the further assignment of error raised by Johnson Properties and the

---

[©] These were post-incorporation stock subscriptions. Such subscriptions are generally treated as contracts between the individual subscriber and the corporation and are subject to the general law of contracts. 4 Fletcher, Law of Private Corporations § 1414 (perm ed 1965). See also, Henn, Law of Corporations § 169 (2d ed 1970).

LaFarlettes that the trial court erred in granting priority to the mechanic's lienor claim over the recorded mortgages.

For reasons stated above, the decree of the trial court is affirmed except as to that portion awarding priority of Johnston Construction Co.'s mechanic's lien claim for its entire labor over Bruckman's prior mortgage on the improvements on the South Parcel. The case is remanded to the trial court for further proceedings not inconsistent with this opinion.