Argued and submitted October 26, 1984, affirmed as modified March 6, motion for clarification of opinion allowed; former opinion adhered to June 5, 1985

See 74 Or App 27, 701 P2d 458 (1985)

KLEINER,
*Appellant,*

*v.*

RANDALL et al,
*Respondents.*

(79-08-7666E; CA A28817)

696 P2d 556

James N. Westwood, Portland, argued the cause for appellant. With him on the briefs were Dennis P. Rawlinson, William H. Walters and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Milo Pope, Mt. Vernon, argued the cause for respondents. With him on the brief were Douglas G. Combs and Kilpatricks & Pope, Mt. Vernon.

Before Buttler, Presiding Judge, and Joseph, Chief Judge, and Warren, Judge.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff, purchaser of real property under two land sale contracts, brought this suit in equity for a declaratory judgment that he is entitled to certain credits against the principal balance remaining on those contracts. The case was tried to the court, which ruled that defendants,[1] sellers of the property, "materially failed to perform" under the contracts, and entered a judgment declaring that plaintiff is entitled to some of the credits claimed. Plaintiff appeals, contending that he is entitled to additional credits and asks that we modify the decree accordingly.

The two contracts involve parts of several contiguous sections of unimproved land in Harney County. Plaintiff planned to improve the property by having wells drilled in each quarter section to provide adequate water for a circle irrigation system. He was concerned about containing the costs of drilling and, for that reason, the parties executed an agreement allocating the well-drilling expenses. Under that agreement, the wells were to be drilled by a third party, Western Water Wells, Inc., and defendants "guaranteed" a minimum of 800 gallons per minute for each quarter section.

The agreement recited that "[defendants have] represented to [plaintiff] that adequate irrigation water is available * * * at a depth not to exceed 350 feet * * *." The cost of drilling the wells was allocated as follows:

"(2)    * * * In the event it becomes necessary to drill a well deeper than 350 feet to obtain the desired 800 gpm minimum, [defendant] will pay Western Water Wells, Inc. for the additional depth necessary to produce 800 gpm. The cost of each well including drilling, casing and packing a 30 inch diameter well with 16 inch louvered 1/4 wall casing shall be computed at $35.00 per foot of depth.

"* * * * *

"(4)    Testing of the gpm produced by a well will be averaged

---

[1] By "defendants" we mean Randall and Dooley, doing business as Associated Farm and Cattle Co. FMA Financial Corporation is the assignee of Associated's contract rights. Plaintiff's claim against Western Water Wells, Inc., the other named defendant, was dismissed by the original judgment entered in this case. Plaintiff's appeal from that judgment is reported in *Kleiner v. Randall*, 58 Or App 126, 647 P2d 956 (1982).

at $1,000.00 per well and any excess above this cost will be paid by [defendants]. * * *

"* * * * *

"(6) In the event the total depth drilled for each well is less than 350 feet and production of irrigation water is 800 gpm minimum, then [plaintiff] will pay to [defendant] the sum of $35. per foot for each foot less than 350 feet in depth. It is the intent by all parties to obtain the maximum production of water for irrigation from each well. If [plaintiff] desires to drill deeper than 350 feet after 800 gpm is proven in order to make a better well then this additional cost shall be paid by [plaintiff]."

The parties' intention in executing the agreement is set forth:

"(5) The intent of this agreement—therefore is meant to guarantee to [plaintiff] that the cost will not exceed $13,500. per quarter section and that any costs in excess of this amount will be paid by [defendants]. * * *"

Evidence admitted at trial included copies of the well driller's invoices detailing the charges for each well drilled. The invoices show that the cost of drilling the wells and related expenses exceeded $13,500 on every quarter section covered by the agreement. Plaintiff claims to have paid those invoices in full, and it is those amounts, less $13,500 per quarter section on the quarter sections producing the guaranteed minimum gallons per minute, which he seeks to have credited against the balance due under the land sale contracts.

■ The trial court found the terms of the well drilling agreement "confusing and inconsistent" and concluded that "[t]here was an overall failure of proof with regard to this claim." It described the failure of proof as follows:

"There are a number of wells that went deeper than 350 feet and which produced more than 800 gallons per minute. It was never explained, however, which of these wells produced 800 gallons per minute above 350 feet and which were simply drilled to a deeper depth to get additional water."

Although we agree with the trial court that it was not explained which wells produced 800 gallons per minute at or above 350 feet and that the agreement is not a model of clarity, we do not agree that there was a failure of proof for those reasons.

On *de novo* review, we reach these conclusions: This

home-drawn agreement resulted from lengthy, arms length negotiations between the parties and was not the product of only one of them. Neither party had significant experience or expertise in drilling wells. There is nothing in the agreement stating who was to decide how deep to drill a particular well or who was to decide the depth at which the wells were to be tested. Instead, the parties agreed that defendants would bear the additional expense "[i]n the event it becomes necessary to drill a well deeper than 350 feet to obtain the desired 800 gallons per minute minimum * * *." There is, however, evidence in the record that the parties mutually understood that the well driller, supervised by a hydrologist-engineer, would decide how deep to drill before testing.[2] The president of

---

[2] Plaintiff testified as follows:

"Q. * * * [W]as it Western Water Wells rather than you that made the professional decisions concerning how deep to drill a particular well?

"A. Yes, they were on the scene and they were observing what was happening.

"* * * * *

"Q. Wasn't it Western Water Wells that made the decision on when to check the flow rates rather than you?

"A. Yes.

"* * * * *

"Q. * * * Mr. Kleiner, as far as the drilling depth and determining once you had a rate flow would be hit [sic], was that responsibility one that you embraced or was it the responsibility of Western Wells?

"A. Well, as a practical matter, I was not on the scene and occasionally I would receive a phone call about the situation, but I didn't have * * *

"Q. Had you ever * * *

"A. I didn't have any effective role to play in that."

In response to questioning by the court about the extent of defendants' responsibility for well drilling costs under the agreement, defendant Dooley testified as follows:

"* * * [I]t was determined that through the discharge, that someway you could tell and through the formations as was testified and I think I agree with the witness a few minutes ago that you can only tell approximately; well, then again Western Water Wells, we got them involved and they said, 'yes, you can tell approximately from this, but that's, it would be an approximate estimation as to where you'd have 800 gallons. And we began then, I guess, as drawing up the agreement stating 800 gallons. * * * And then so, it was written up then if we decide that we got three hundred, 800 gallons at 300 feet, well then the question came up as to how deep you had to go, we'd had some wells drilled by, I think, a cable tool, and at that time, knew little about it and a very little, and I think a discussion as to how deep for some of your wells, and we had wells then out here at that time from 200 to 500, but I think basically an average not more than 350, so we arrived somehow at the 350, and said 'well if we get it at 300 and feel, but we're

Western Water Wells, Inc., the well driller, was the son of one of the defendants, and that well driller was recommended to plaintiff by defendants.

Neither the well driller nor the supervising hydrologist-engineer was called to testify at the trial. Plaintiff did call Mr. Pallin, a well tester, as an expert witness. Defendants did not challenge Pallin's credentials or the relevance of his testimony. He testified that it is normal practice to drill until a water-bearing formation capable of producing the desired amount of water is found before testing. On cross-examination, Pallin was asked to review the well driller's log detailing the geological formations encountered during the drilling of two wells. He testified that, in his opinion, the driller drilled to appropriate depths before testing. One of those wells was drilled to a depth of 432 feet,[3] the other to 480 feet. Although Pallin was not specifically asked about the other wells, there is no evidence that any well was drilled deeper than reasonably necessary or that plaintiff authorized additional drilling beyond depths appropriate for testing.

Under these circumstances, defendants' contention that plaintiff had to prove the flow rate of each well at 350 feet before an allocation of expenses between the parties can be made is without merit. That contention is, at bottom, nothing less than an attempt to add to the agreement a term that would have required plaintiff to have each well tested at 350 feet, regardless of whether there was a reasonable expectation of obtaining sufficient water at that level. There is no such provision in the contract. Rather the parties showed, by their course of conduct, who they intended would decide when to test the wells.

There is no reason not to enforce the express terms of the agreement. It follows that, on each quarter section with a well or wells producing 800 gallons per minute or more, plaintiff is responsible for the drilling costs at the rate of $35

---

still in water bearing formations, or 350, *should we stop if the well drilling company's estimate that we have right now for 800 gallons or should we go on.'* " (Emphasis supplied).

[3] The well to which the witness referred is designated as number five. It was actually drilled to a depth of 620 feet, but the completed well was 432 feet, because the driller backfilled the well from 620 feet to 432 feet. There was a substantial expense involved in doing so, but the record supplies no explanation of why it was done.

per foot to a depth of 350 feet and for the cost of testing the wells up to a maximum of $1,000.[4] Defendants are responsible for the remaining costs. In any quarter section where the guaranteed 800 gallons per minute minimum was not produced, plaintiff is not responsible for the drilling costs. Applying those principles, plaintiff is entitled to $150,007, according to the calculations set forth in the margin.[5]

■    The second credit to which plaintiff claims he is entitled involves defendants' apparent inability to convey good title to 20 acres of the property covered by the April 27, 1978, contract. The trial court found that defendants' failure to have good title was a breach of the contract, and that finding is uncontested. However, the trial court denied plaintiff's request to abate the purchase price of the property,[6] because there was "insufficient evidence to determine with any degree of certainty the value attributed to the 20 acres." Plaintiff asks that we abate the price by $15,000, arguing that the market value of the 20 acres is established by the fact that

---

[4] The agreement also provided:

"(3) The cost of supervising the well by Mel Davenport or other competent hydrauligist [sic] will be paid by [plaintiff] and may vary, it is estimated the fee charged for such supervision, professional advice and filing for registrations with the State Water Commission of Oregon is $250.00, if the fee exceeds this amount, the additional amounts will be paid by [plaintiff]."

The record is completely silent on fees charged by the hydrologist for supervision and professional advice, and is also silent on the amount of state filing fees. Consequently, we are unable to allocate those expenses between the parties.

[5]

| QUARTER SECTION | DRILLING COSTS | − (350 × $35) + | TESTING COSTS | − $1,000 = | TOTAL |
|---|---|---|---|---|---|
| N.W. 8 | $42,680 | $12,250 | $7,875 | $1,000 = | $ 38,305 |
| S.W. 8 | 29,250 | 12,250 | 7,599 | 1,000 = | 24,089 |
| S.E. 9 | 15,120 | 12,250 | 2,448 | 1,000 = | 6,318 |
| N.W. 05 | 39,480 | 12,250 | 4,671 | 1,000 = | 30,901 |
| N.E. 15 | 15,960 | 12,250 | 2,498 | 1,000 = | 5,208 |
| N.W. 16 | 21,000 | 12,250 | 2,558 | 1,000 = | 10,308 |
| *S.W. 9 | 13,580 | -0- | 1,112 | -0- = | 14,692 |
| *N.W. 17 | 15,120 | -0- | 5,066 | -0- = | 20,186 |
| | | | | | $150,007 |

* Quarter sections not producing the guaranteed 800 gallons per minute minimum.

[6] Plaintiff argues, for the first time on appeal, that he is entitled to partial rescission of the April contract, because the unconveyed 20 acres is essential to his enjoyment of the quarter section of which it is a part. Plaintiff may be correct on the law, but he did not seek that remedy in the trial court. *See Friesen v. Fuiten,* 257 Or 221, 230-31, 478 P2d 372 (1970).

defendants subsequently contracted with the owner to purchase the 20 acres for that amount.

We agree that the sale price between defendant and the third party is some evidence of the market value of the 20 acres. However, because plaintiff does not seek damages for breach of contract, but rather seeks to abate the purchase price, we think that evidence of the market value of the property in question is irrelevant. Market value is relevant when a plaintiff seeks to recover the benefit of his bargain lost due to a defendant's breach of contract, but plaintiff is only seeking to avoid paying for something that was not delivered as promised and to be put back in the position he would have occupied had the 20 acres not been part of the contract. It is clear that plaintiff is entitled to an abatement of the price he was to pay for the 20 acres under the contract if defendants are unable to convey good title and if that amount can be determined. *See generally* 3 Corbin, Contracts, § 604 (1960).

The contract in which that 20 acres is included provides that plaintiff will pay $196,326.89 for six quarter sections of undeveloped land in Harney County. Plaintiff contends that there is no basis in the record for distinguishing the value of one quarter section from any of the others. We think that the same can be said with respect to portions of land within the quarter sections and, although the contract price is not expressly based on a fixed amount per acre, we conclude that plaintiff is entitled to abatement of the price in an amount no less than the average price per acre. The contract price on a *pro rata,* per acre basis, is $233.72, a total of $4,674.40 for 20 acres. Plaintiff is entitled to abatement of the contract price in that amount if defendants are unable to convey good title to the 20 acres promised in the April 27, 1978, contract when they are required to convey by the terms of the contract.

In summary, plaintiff is entitled to additional credits against the principal balance due under the land sale contracts for $150,007, the excess well drilling costs, plus $4,674.40, if defendants are unable to convey good title to the 20 acres when they are required to convey the property under the terms of the contract. The judgment is so modified; the judgment is affirmed in all other respects.