Argued and submitted November 3, 1994, decision of the Court of Appeals affirmed; judgment of the circuit court affirmed in part and reversed in part, and case remanded to the circuit court for further proceedings March 30, 1995

HAMPTON TREE FARMS, INC.,
*Petitioner on Review,*

*v.*

Kate W. JEWETT,
Personal Representative of the
Estate of William W. Jewett, Deceased,
and Erickson Hardwood Company,
*Respondents on Review,*

*and*

Daniel A. ERICKSON,
*Appellant,*

*v.*

John C. HAMPTON
and Diamond Wood Products, Inc.,
an Oregon corporation,
*Respondents.*

(CC 9004-02368; CA A70222; SC S41148)

892 P2d 683

Jeffrey M. Batchelor, of Lane Powell Spears Lubersky, Portland, argued the cause for petitioner on review. With him on the petition was David G. Hosenpud, Portland.

John L. Langslet, of Martin, Bischoff, Templeton, Langslet & Hoffman, Portland, argued the cause for respondents on

review Erickson Hardwood Company, and Kate W. Jewett and Daniel A. Erickson. With him on the responses was Julie K. Bolt, Portland.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiff, Hampton Tree Farms, Inc. (Hampton), seeks review of a Court of Appeals decision reversing the trial court's grant of Hampton's motion for summary judgment as to the counterclaims of defendant Erickson Hardwood Company (EHC).[1] *Hampton Tree Farms, Inc. v. Jewett*, 125 Or App 178, 865 P2d 420 (1993). The issue is whether the trial court correctly determined that there is no genuine issue as to any material fact on EHC's claims and that Hampton is entitled to a judgment as a matter of law. ORCP 47 C. For the reasons that follow, we affirm the decision of the Court of Appeals.

### FACTS AND PROCEDURAL BACKGROUND

EHC owned a lumber and pallet manufacturing plant in Garibaldi and another plant and dry kilns in Grande Ronde. Hampton was EHC's major supplier of logs, which were essential to EHC's pallet industry. In February 1986, William Jewett obtained for Hampton's benefit an irrevocable letter of credit as security for logs sold by Hampton to EHC. The letter required the issuing bank to make immediate payment to Hampton of up to $100,000 if EHC's debt to Hampton became more than 11 days overdue. EHC's account was more than 11 days overdue most of the time, but Hampton did not draw on the letter of credit. Jewett extended and increased the letter of credit several times. By the fall of 1987, EHC owed Hampton over $300,000. Hampton was unwilling to continue supplying logs to EHC without further assurance that EHC would pay its debt.

In October 1987, in order to induce Hampton to continue selling logs to EHC, Erickson and Jewett signed a guaranty agreement in favor of Hampton. That agreement

---

[1] The claims at issue before this court involve only plaintiff Hampton Tree Farms, Inc., and defendant Erickson Hardwood Company. John Hampton was president of Hampton. Daniel Erickson was EHC's president and its sole shareholder. Natalie Jewett is the personal representative of the estate of William Jewett, deceased, an officer of EHC who signed a guaranty in favor of Hampton. The trial court granted Hampton's motion for summary judgment on counterclaims brought individually by Erickson and Jewett, on the ground that their claims were derivative of EHC's counterclaims. That ruling is not at issue on review. Defendants' third-party claims against John Hampton and Diamond Wood Products, Inc., were dismissed by the trial court and are not at issue on review.

provided that Erickson and Jewett jointly and severally guaranteed prompt payment to Hampton "at maturity of every note, check, loan, advance, contract for payment of logs and all other claims or indebtedness for which [EHC] is now liable or shall become liable to Hampton in the future." The guaranty was "continuing." It was to "remain in full force until revoked." Erickson and Jewett also agreed that, in the event of EHC's default, they personally would "pay on demand all sums due and to become due."

In December 1987, EHC filed for protection under Chapter 11 of the Bankruptcy Code. Hampton continued to supply EHC with logs, and EHC's debt grew to $810,000. In February 1988, Hampton prepared an order for approval by the bankruptcy court, containing the following terms: Hampton would continue to supply logs to EHC and, in return, Hampton would be given a post-petition first-priority security interest and lien on the logs, products, accounts, and proceeds from the sale of the products. The proposed order also provided that EHC would give Hampton projected operating cash flow budgets, weekly invoices, and monthly financial reports; that a separate account would be established for deposit of cash proceeds of Hampton's collateral; that Hampton would receive at least 40 percent of the funds deposited in the account; that, if that amount was insufficient to pay outstanding balances, then EHC would pay more, so that no invoices would be over 30 days old; and that Hampton's approval was required for any purchase by EHC over $2,000. Hampton and EHC signed the proposed order. Also in February 1988, Jewett replaced the letter of credit with a $250,000 certificate of deposit, issued in Jewett's and Hampton's names jointly, subject to the terms of a pledge agreement that gave Hampton the sole right to redeem the certificate in the event of EHC's default.

In July 1988, Smith, Hampton's vice-president, wrote a letter "To Whom it May Concern," stating in part:

"[Hampton Tree Farms, Inc., is] the principal supplier [] of alder logs to Erickson Hardwood at Garibaldi, Oregon. Erickson Hardwood processes the alder logs into pallets. Presently, Erickson Hardwood has 1,500 MBF of alder logs on hand for processing into pallets. As to future log supply, we do not believe that we will experience any major curtailment in log deliveries to Erickson Hardwood for the pallet

operations at Garibaldi, Oregon. Placing your pending order for pallets with Erickson Hardwood will be helpful."

EHC's Chapter 11 reorganization was confirmed by the bankruptcy court in November 1988. The plan indicated that EHC had secured a steady supply of logs from Hampton and that Hampton had "agreed to supply the logs and to receive payments only after the Debtor [EHC] is paid for the finished product." John Hampton understood the plan to require Hampton to purchase logs from outsiders for EHC's use should Hampton be unable to meet EHC's requirements. All parties understood that the success of the plan was contingent on Hampton's continuing to supply logs to EHC, because EHC had no other source of logs. John Hampton told Jewett that he believed that EHC was a viable business and, in reliance on that statement, Jewett increased the amount of his guaranty. EHC and Hampton worked together closely, and financial statements show that, by the spring of 1989, EHC's income exceeded its expenses and its debts were diminishing.

By May 1989, EHC had significantly reduced its debt to Hampton. However, EHC still owed Hampton more than $600,000. Hampton became concerned about the ratio of EHC's inventory to its receivables. During a meeting with Erickson and Jewett, John Hampton stated that Hampton would require additional security. When asked if Hampton would renege on its agreement to supply logs to EHC, John Hampton said that it would not. The parties then agreed to additional security, and EHC agreed to increase the percentage of its receivables to be paid to Hampton. At that same meeting, John Hampton suggested that EHC should sell its Garibaldi mill. Erickson and Jewett agreed that John Hampton would "explore the market" and report back to them. John Hampton stated that he would assure potential buyers of the mill that Hampton would continue to supply logs to EHC and that no shutdown of the mill was anticipated.

In June 1989, John Hampton told Jewett that a deal had been made to sell the mill to Diamond Wood Products (Diamond). Later, John Hampton told Erickson that he had sold the mill to Diamond for $2.5 million. Erickson pleaded with John Hampton not to sell, arguing that the mill was becoming profitable and would succeed. John Hampton

responded that EHC should seek outside financing, because Hampton was unwilling to continue supplying logs to EHC on the previously agreed terms. That same month, Hampton began reducing the supply of logs to EHC.

Erickson thereafter met with potential investors who expressed an interest in purchasing lumber from EHC and in providing financing. Erickson told them that he needed to consult with John Hampton, because Hampton was EHC's sole supplier of logs. Erickson met with John Hampton, who refused to agree to the arrangement with the potential investors. John Hampton again told Erickson that the mill had been sold to Diamond, that Diamond would get all of Hampton's logs, and that Erickson should discontinue seeking outside financing.

In July 1989, John Hampton met with Diamond to negotiate the details of the sale of EHC's mill. EHC was not informed of that meeting. John Hampton proposed that Diamond buy the mill for $1.5 million in cash and the release of Erickson and Jewett from their guarantees, and that a payment of $1 million be made later. John Hampton prepared a memorandum of understanding that included those terms, which Diamond's president signed. Diamond thereafter made a counterproposal, which it presented to John Hampton at another meeting. EHC was not informed of that meeting. Diamond's counterproposal reflected Diamond's concern that EHC's creditors would continue to have liens on EHC's equipment after the sale. Diamond proposed, therefore, that EHC should petition the bankruptcy court for modification of its reorganization plan, to require liquidation following acceptance of Diamond's offer to buy the Garibaldi mill for $800,000, or its offer to buy both the Garibaldi and the Grande Ronde mills for $1,200,000. Under Diamond's counterproposal, all but one of EHC's secured creditors would have been paid. Diamond also indicated to John Hampton that Diamond might just wait for EHC to collapse, hoping to acquire EHC's assets at a lower price. Hampton continued to assure EHC that a sale to Diamond would go through.[2] Because of his experience, John Hampton knew, or should

---

[2] It is not clear exactly when Erickson and Jewett became involved in the negotiations with Diamond.

have known, that the mill had more value if it was operating than if it was closed.

Because Hampton controlled EHC's log supply, EHC, Jewett and Erickson were forced to agree to sell the mill and other assets and to drop their negotiations with the potential investors. In July 1989, an earnest money agreement was executed by Diamond, EHC, Erickson, and Jewett, which provided that Diamond would pay $1,400,000 for the mills at Garibaldi and Grande Ronde, with a further payment of $900,000 to be made at a future date. The agreement contained in the earnest money agreement differed from the prior proposal of John Hampton and from Diamond's counterproposal. Thereafter, without explanation to EHC, Hampton discontinued supplying logs to EHC. By August 1, 1989, EHC closed its Garibaldi mill due to a lack of logs.

In early August 1989, Diamond notified EHC that it would not close the sale as agreed but, instead, proposed to buy the Garibaldi mill for $700,000, on condition that EHC release any claim that it might have against Diamond. EHC rejected that offer, telling Diamond that EHC might consider selling the Garibaldi mill for $700,000 if Diamond would represent that it had not acted alone or in concert with John Hampton to harm EHC. Diamond did not respond. In September 1989, Erickson met with his lawyers to discuss potential claims against Hampton and Diamond.

In October 1989, John Hampton advised Jewett of his intention to redeem the certificate of deposit. That same month, EHC's creditors declared a default, and EHC's Chapter 11 reorganization was converted to a Chapter 7 liquidation. EHC thereafter moved in bankruptcy court to dismiss the Chapter 7 case, stating:

> "All of the Debtor's [EHC'S] assets have been pledged as collateral to the Small Business Administration. These assets are worth less than the amount owing to the SBA. The SBA has filed with the Bankruptcy Court a request for Non-Judicial Relief from the Automatic Stay. The Debtor does not object to this request and expects the Bankruptcy Trustee to sign the request during the week of November 6, 1989.

> "Once the Bankruptcy Trustee signs the request there will be no assets for administration by the Bankruptcy Court or Trustee. Consequently the Debtor does not believe that

there is any reason to proceed with administration of a Chapter 7 case as for all practical purposes the Debtor has ceased to exist."

None of EHC's creditors opposed the dismissal. In November 1989, the bankruptcy court dismissed the case without prejudice. Several days before the dismissal was ordered, EHC's lawyers recommended that EHC bring claims against Hampton for breach of contract and breach of fiduciary duty. In February 1990, the Small Business Administration sold both mills to Diamond for $210,000. Since that time, Hampton has supplied logs to Diamond.

In April 1990, Hampton filed this action to enforce the guaranty and pledge agreement made by Jewett. The trial court granted Jewett's motion to have EHC and Daniel Erickson joined as defendants, pursuant to ORCP 29 A.[3] In July 1990, EHC, Erickson, and Jewett filed counterclaims against Hampton for breach of contract to sell the mill and to supply logs, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and negligence.

Hampton moved for summary judgment on all of EHC's claims, arguing that, in the light of EHC's representation to the bankruptcy court that it had no assets other than those pledged as collateral to the Small Business Administration, EHC should be "judicially estopped" from asserting any of its claims against Hampton. Alternatively, Hampton argued that there were no genuine issues of material fact on any of EHC's claims and that Hampton was entitled to judgment as a matter of law. On the basis of the record before it, the trial court granted summary judgment to Hampton on EHC's claims, on the ground that EHC was judicially estopped from asserting them because, before securing a

---

[3] ORCP 29 A provides:

"A person who is subject to service of process shall be joined as a party in the action if (1) in that person's absence complete relief cannot be accorded among those already parties, or (2) that person claims an interest relating to the subject of the action and is so situated that the disposition in that person's absence may (a) as a practical matter impair or impede the person's ability to protect that interest or (b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of their claimed interest. If such person has not been so joined, the court shall order that such person be made a party. If a person should join as a plaintiff but refuses to do so, such person shall be made a defendant, the reason being stated in the complaint."

dismissal of its Chapter 7 liquidation, EHC had represented to the bankruptcy court that it had no assets, knowing that it intended to assert claims against Hampton. The trial court ruled that the claims of Jewett and Erickson were derivative and that they were likewise barred. Hampton's breach of guaranty claim against Jewett went to trial and resulted in a jury verdict for Hampton.[4]

EHC, Erickson, and Jewett appealed, arguing that the trial court erred in granting summary judgment on their claims and in failing to grant their motion for a directed verdict on Hampton's claim. Hampton cross-appealed, arguing that the trial court erred in failing to award it attorney fees, because it prevailed on EHC's counterclaims. The Court of Appeals determined that the doctrine of judicial estoppel was not applicable to bar EHC from asserting claims, because Hampton had not shown that EHC had benefited by the dismissal of EHC's bankruptcy proceeding.[5] The court also determined that Hampton had not shown that it had relied to its detriment on the position taken by EHC in the bankruptcy proceeding. *Hampton Tree Farms*, 125 Or App at 186-89. The court concluded that there were genuine issues of material fact regarding each of EHC's claims and, therefore, that Hampton was not entitled to summary judgment. *Id.* at 189-93. Accordingly, the court remanded the case to the trial court for further proceedings. *Id.* at 198.[6]

Hampton petitioned this court for review, arguing that the Court of Appeals erred in holding that judicial estoppel did not bar EHC's claims and in holding that Hampton was not entitled to summary judgment on EHC's claims. We allowed review and first consider the issue of judicial estoppel.

---

[4] Hampton's claims to enforce the guaranty and pledge agreement against Jewett are not at issue on review.

[5] The Court of Appeals also stated that, because the events that form the basis for EHC's claims against Hampton did not occur until August 1989, almost two years after EHC had filed for bankruptcy reorganization under Chapter 11 and after the reorganization plan had been approved, "[i]t is not clear that [EHC's] claims would have been considered assets of the [bankruptcy] estate." *Hampton Tree Farms, Inc. v. Jewett*, 125 Or App 178, 188, 865 P2d 420 (1993).

[6] In view of its disposition of the appeal, the Court of Appeals did not reach Hampton's cross-appeal for attorney fees. 125 Or App at 198.

## JUDICIAL ESTOPPEL

Hampton contends that the Court of Appeals erred in not applying the doctrine of judicial estoppel to EHC's claims. Hampton argues that the Court of Appeals erroneously concluded that judicial estoppel depends for its application on a showing that one party benefited from its representations to the first tribunal and that the other party "detrimentally relied" on the first party's prior representation.

■ Judicial estoppel is a common law equitable principle that has no single, uniform formulation in the several jurisdictions in which it has been recognized. *See generally* Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield,* 55 Geo Wash L Rev 409 (1987) (summarizing approaches used by courts). The purpose of judicial estoppel is "to protect the judiciary, as an institution, from the perversion of judicial machinery." *Edwards v. Aetna Life Ins. Co.,* 690 F2d 595, 599 (6th Cir 1982). The doctrine may be invoked under certain circumstances to preclude a party from assuming a position in a judicial proceeding that is inconsistent with the position that the same party has successfully asserted in a different judicial proceeding. *See generally Caplener v. U.S. National Bank,* 317 Or 506, 516, 857 P2d 830 (1993) (stating principle); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F2d 414, 417 (3d Cir), *cert den* 488 US 967 (1988) (same).[7] Some courts have stated that judicial estoppel should apply when a litigant "is playing fast and loose with the courts." *Sandstrom v. Chemlawn Corp.,* 904 F2d 83, 87-88 (1st Cir 1990) (citing *Scarano v. Central R. R.,* 203 F2d 510 (3d Cir 1953)); *Grant v. Lone Star Co.,* 21 F3d 649, 651 n 2 (5th Cir), *cert den* ___ US ___ (1994); *Fleck v. KDI Sylvan Pools, Inc.,* 981 F2d 107, 121-22 (3d Cir 1992) (judicial estoppel is

---

[7] The doctrine of "judicial estoppel" has been applied by federal courts to hold that a debtor who invokes the protection of the bankruptcy court and purports to disclose all of its assets, including claims that it might assert in litigation, is precluded from later asserting a claim that existed at the time of the bankruptcy but was not disclosed. *In Matter of Howe,* 913 F2d 1138, 1147 (5th Cir 1990); *In re Louden,* 106 BR 109, 112 (Bkrtcy ED Ky 1989); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F2d 414 (3rd Cir), *cert den* 488 US 967 (1988). Courts also rely on the principles of *res judicata* and equitable estoppel in holding that a failure to disclose existing claims during the pendency of a bankruptcy proceeding bars the debtor's later assertion of the undisclosed claims. *In re Hoffman,* 99 BR 109 (Bkrtcy ND Iowa 1989).

intended to protect the courts rather than the litigants), *cert den* ___ US ___ (1993); *Rockwell Intern. v. Hanford Atomic Metal Trades*, 851 F2d 1208, 1210 (9th Cir 1988) (same). Other courts have said that judicial estoppel should be used only to preclude a party from taking an inconsistent position in a later proceeding if that party has "received a benefit from the previously taken position in the form of judicial success." *Water Technologies Corp. v. Calco, Ltd.*, 850 F2d 660, 665 (Fed Cir), *cert den* 488 US 968 (1988). *See Bates v. Long Island R. Co.*, 997 F2d 1028, 1038 (2d Cir) (the prior inconsistent position must have been adopted by the court in some manner), *cert den* ___ US ___ (1993); *Edwards*, 690 F2d at 599 (judicial estoppel cannot be applied in a subsequent proceeding unless a party has successfully asserted an inconsistent position in a prior proceeding); *Konstantinidis v. Chen*, 626 F2d 933, 939 (DC Cir 1980) (success in the prior proceeding is an essential element of judicial estoppel); *see also* Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, NW U L Rev 1244 (1986) (favoring "prior success" rule).

In this case, the Court of Appeals concluded that an essential component of the defensive application of judicial estoppel is that the party sought to be estopped must have benefited as a result of its earlier assertion of an inconsistent position in a different judicial proceeding. *Hampton Tree Farms*, 125 Or App at 188-89. Although this court has never specifically stated that the party sought to be estopped must have benefited as a result of its earlier assertion of an inconsistent position taken in a different judicial proceeding, in the only case in which this court has discussed the doctrine of judicial estoppel, *Caplener*, this court considered the fact that the party sought to be estopped had benefited from its prior inconsistent position in a different judicial proceeding. In *Caplener*, the party against whom judicial estoppel was asserted had its debts discharged in bankruptcy. *Caplener*, 317 Or at 509. The issue was whether that party's underdisclosure in bankruptcy court of its state court claims against one of its creditors precluded the party from later increasing the amount of those claims in a civil action. This court stated:

> "The Caplener Brothers' amended disclosure statement accompanying its reorganization plan specifically 'excluded

the litigation pending between U.S.N.B. and Doyle Caplener from the assets of the [bankruptcy] estate, because it is speculative and all creditors will be paid in full without use of its potential proceeds.' The record shows that [U.S. National] Bank was one of the creditors approving the reorganization plan. Also on record are the bankruptcy court's stipulated orders authorizing post-petition financing of Caplener Brothers by Bank. As noted above, Bank would not have consented to provide that interim financing had it been aware of a claim in excess of $11 million against it.

"Was Caplener Brothers' failure to dispute Bank's claim, and its stipulation to the validity of Bank's claim in order to obtain post-petition financing, as well as its disclosure of only a $451,000 claim against Bank, fundamentally at odds with its current position that it may maintain a claim for over $11 million? We believe that those positions were inconsistent and that, under the circumstances, plaintiffs are judicially estopped." *Id.* at 520 (footnote omitted).

Thus, the party being estopped in *Caplener* had benefited as a result of its earlier assertion of an inconsistent position taken in the bankruptcy court, first by being able to obtain interim financing, and later by having all its debts discharged without disclosure of its $11 million claim against the bank. Notwithstanding, in *Caplener*, this court made no attempt to formulate the general principles of the doctrine of judicial estoppel.

■■ We now turn to the specifics of the present case to determine whether Hampton properly may assert the affirmative defense of judicial estoppel. That inquiry involves three issues: benefit in the earlier proceeding, different judicial proceedings, and inconsistent positions. The Court of Appeals concluded that the doctrine of judicial estoppel should not be applied in this case. First, the court was not persuaded that EHC's position in bankruptcy court was necessarily inconsistent with its position in this case. 125 Or App at 188. Second, the court was not persuaded that EHC had benefited as a result of the court's dismissal without prejudice of the bankruptcy proceeding. 125 Or App at 188-89.

We can find no evidence in the record from which the trial court could have concluded as a matter of law that EHC obtained any benefit by having its Chapter 7 proceeding dismissed without prejudice. The dismissal of its Chapter 7 proceeding without prejudice did not discharge EHC's debts,

and it provided EHC with no protection from enforcement of its creditors' claims. In fact, it would appear that EHC only increased its exposure to its creditors by leaving the protective cloak of bankruptcy. *Compare Caplener*, 317 Or at 509 (debts of party being judicially estopped had been discharged in bankruptcy). Because we conclude that Hampton has not shown that EHC benefited in the bankruptcy proceeding, we need not determine whether the Court of Appeals correctly determined that Hampton had not shown that EHC's position in the bankruptcy proceeding was "inconsistent" with its position in this case. Accordingly, we hold that the trial court erred in granting summary judgment for Hampton on EHC's claims on the ground that EHC was judicially estopped from bringing those claims.

■■ Before proceeding to consider the trial court's summary judgment rulings on their merits, we note that in *dictum* the Court of Appeals recognized a requirement that the party raising judicial estoppel as an affirmative defense must also show "that it relied to its detriment on the position taken by the other party in the earlier proceeding." *Hampton Tree Farms*, 125 Or App at 187. Although this court in *Caplener* considered the fact that the bank would not have offered interim financing in the bankruptcy had the Capleners' claim been fully disclosed and, thus, might be said to have "detrimentally relied" on the underdisclosure, this court did not hold in that case that detrimental reliance was a necessary component of judicial estoppel. Because judicial estoppel is primarily concerned with the integrity of the *judicial* process and not with the relationship of the parties, it does not depend for its application on a showing that the party raising judicial estoppel as an affirmative defense detrimentally relied on the other party's prior inconsistent position. We now specifically reject the Court of Appeals' suggestion that the party raising judicial estoppel as an affirmative defense has the burden to show that it relied to its detriment on the inconsistent position taken by the other party in the earlier judicial proceeding. *See Ward Cook, Inc. v. Davenport*, 243 Or 301, 310-11, 413 P2d 387 (1966) (plaintiff is bound by choice of a substantive right in earlier judicial proceeding and, thus, is precluded from making a wholly inconsistent claim in a subsequent judicial proceeding; detrimental reliance

not required); *Bakker v. Baza'r, Inc.*, 275 Or 245, 272 n 15, 551 P2d 1269 (1976) (Tongue, J., dissenting) (detrimental reliance not required); *Oneida Motor Freight, Inc.*, 848 F2d at 419 (judicial estoppel looks to the connection between the litigant and the judicial system, while equitable estoppel focuses on the relationship between the parties); *Konstantinidis*, 626 F2d at 937 (judicial estoppel does not require proof of privity, reliance, or prejudice); 1 B, *Moore's Federal Practice* § 0.405[8] (1994) (a party may invoke the doctrine without having to show reliance or prejudice); Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield*, 55 Geo Wash L Rev at 416-17 (in contrast to equitable estoppel, judicial estoppel requires neither privity, nor reliance, nor detriment). The harm to the judicial system that arises from allowing a party in a later judicial proceeding to contradict a position successfully taken in an earlier judicial proceeding arises whether or not there is any detrimental reliance by another party.[8] We proceed to consider the trial court's summary judgment rulings on their merits.

On review of a summary judgment, this court determines whether there was a genuine issue as to any material fact and whether the moving party was entitled to judgment as a matter of law. ORCP 47 C. In reviewing a trial court's ruling on a motion for summary judgment, this court views the evidence and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party, including all reasonable inferences of fact therefrom. On Hampton's motion for summary judgment, the burden falls on Hampton even though EHC would have had the burden of establishing its claims at the time of trial. *Welch v. Bancorp Management Services*, 296 Or 713, 716, 679 P2d 866 (1984). The record on summary judgment consists of all exhibits and depositions submitted by the parties in support of, or in opposition to, the motion for summary judgment, and that is the record that we review here. *Fields v. Jantec*, 317 Or 432, 437, 857 P2d 95 (1993).

---

[8] Although detrimental reliance is not a component of judicial estoppel, it may be a relevant consideration. *See Davis v. Wakelee*, 156 US 680, 689, 15 S Ct 555, 39 L Ed 578 (1895) (party may not assume a contrary position in later judicial proceeding, "especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him").

## BREACH OF CONTRACT

Hampton contends that the Court of Appeals erred in reversing the trial court's award of summary judgment to Hampton on EHC's claim for breach of contract to supply logs.[9] Hampton argues that its oral promise to supply logs was not sufficiently definite to result in an enforceable contract and that the indefinite duration of the agreement is fatal to its enforcement.

■ Viewing the record on summary judgment in the light most favorable to EHC, there is evidence in the record to support EHC's claim that a contract to supply EHC with logs was formed. That evidence includes the 1988 order prepared by Hampton and presented to the bankruptcy court, Hampton's acceptance of EHC's approved Chapter 11 reorganization plan that reiterated Hampton's commitment to supply logs, and Hampton's 1988 "To Whom it May Concern" letter soliciting business for EHC. There also is evidence from which a jury could find that the alleged contract to supply logs was intended to continue until EHC had satisfied its debt to Hampton and the mill had become profitable. Moreover, in May 1989, John Hampton told EHC that Hampton would not renege on its agreement to supply logs and in return EHC agreed to increase the percentage of its receivables to be paid to Hampton and provided other security for its debt.

■ Hampton argues in the alternative that, because no time period was specified regarding how long Hampton would supply logs, no contract exists. However, the absence of an explicit term regarding the time period of a contract is not necessarily fatal. *See* ORS 72.2040; ORS 72.3090.[10] Nor is the

---

[9] The Court of Appeals affirmed the trial court's award of summary judgment to Hampton with respect to EHC's claim for breach of contract to sell the mill. 125 Or App at 195-97. That issue is not before this court on review.

[10] ORS 72.2040 provides in part:

"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"* * * * *

"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

ORS 72.3090(2) provides that a contract involving successive performances which is

absence of a specific "quantity" term necessarily fatal to a claim that a requirements contract has been formed. *See, e.g.*, ORS 72.3060 (relating to output, requirements, and exclusive dealings contracts for the sale of goods). Moreover, there is evidence in the record from which a jury could infer, for example, that, in the light of the bankruptcy court's order and the approved reorganization plan, the parties intended an agreement to supply logs for the duration of EHC's Chapter 11 reorganization. We conclude that there is a genuine issue of material fact with respect to the alleged contract to supply logs. We hold that the trial court erred in granting summary judgment to Hampton on EHC's claim for breach of contract to supply logs.

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

Hampton contends that the Court of Appeals erred in reversing the trial court's award of summary judgment to Hampton on EHC's claim for breach of the duty of good faith and fair dealing. Hampton argues that there was no duty of good faith and fair dealing, because there was no contract to supply logs. Hampton makes no argument with respect to whether the record supports EHC's claim on its merits.

The law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract. That duty serves to effectuate the objectively reasonable expectations of the parties. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 349-53, 876 P2d 761 (1994); *Sheets v. Knight*, 308 Or 220, 233, 779 P2d 1000 (1989); *Best v. U. S. National Bank*, 303 Or 557, 561-64, 739 P2d 554 (1987).

We already have concluded that summary judgment was inappropriate on EHC's claim for breach of contract to supply logs. Viewing the record on summary judgment in the light most favorable to EHC, there is evidence in the record from which a jury could find that, with respect to the alleged contract to supply logs, Hampton did not at all times act in good faith and deal fairly with EHC. For example, after an earnest money agreement was executed in July 1989 for

---

indefinite in duration may be valid "for a reasonable time." Under ORS 72.3090(3), "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party[.]"

Diamond to buy both mills, Hampton, without explanation, discontinued supplying logs to EHC, resulting in the closure of the Garibaldi mill by August 1. A jury could find that Hampton's unilateral action in discontinuing to supply logs frustrated EHC's objectively reasonable expectation that Hampton would continue to supply logs. We hold that the trial court erred in granting summary judgment to Hampton on EHC's claim for breach of the duty of good faith and fair dealing.

## BREACH OF FIDUCIARY DUTY

Hampton contends that the Court of Appeals erred in reversing the trial court's award of summary judgment to Hampton on EHC's claim for breach of fiduciary duty. Hampton argues that, because the relationship between the parties was a relationship of debtor and creditor, their relationship was "the antithesis of a fiduciary" relationship and that nothing Hampton did could transform it into a fiduciary relationship.

EHC's theory was that the parties had "agreed that John Hampton would investigate the possibility of selling the Erickson Hardwood mill," and that Hampton undertook to sell the Erickson Hardwood mill on behalf of and for the benefit of and therefore *as an agent* and fiduciary of EHC.

This court's decision in *Georgetown Realty v. The Home Insurance Co.*, 313 Or 97, 106, 831 P2d 7 (1992), is the starting point for determining whether a tort claim is available to a contracting party:

> "The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contact, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of

contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both."

 Here, EHC and Hampton allegedly were contracting parties, inasmuch as they had an agreement to buy and sell logs. A fiduciary relationship did not arise simply from that agreement. The dispositive issue is whether Hampton was subject to a standard of care independent of the contract. If Hampton was not subject to a standard of care independent of the contract, then no tort claim is available against it.

 As noted, EHC claimed the existence of a principal-and-agent relationship between EHC and Hampton. An agent owes duties of care and loyalty to the principal. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 161, 843 P2d 890 (1992). An agent must exercise reasonable care on behalf of the principal's interest. *Id.* at 160. An agent thus is subject to a standard of care independent of the terms of an agreement between the parties.

This court has defined "agency" as follows:

"[T]he relationship which results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act. * * * [A]n agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." *Ruddy v. Ore. Auto. Credit Corp.*, 179 Or 688, 702, 174 P2d 603 (1946) (citations omitted; internal quotation marks omitted).

In reviewing a trial court's ruling on a motion for summary judgment, this court views the evidence and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Fields*, 317 Or at 437. If facts were established from which we could infer that a principal-and-agent relationship existed, then, EHC's claim for breach of fiduciary duty would survive this motion for summary judgment.

 There is evidence in the record from which one could infer that Hampton had consented and undertaken to act as EHC's agent to sell the mill and that EHC retained some control over Hampton in that regard. John Hampton stated

in his deposition that he understood that he was "to go out and try to find a buyer for the mill," but that he lacked the authority to sell the mill. John Hampton did find a buyer for the mill. One reasonably could infer, based on that evidence, that John Hampton consented to act on behalf of EHC to find a buyer for the mill and that EHC retained some element of control over the actual sale of the mill.

We next turn to whether EHC consented to having John Hampton act as its agent. Such a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control" is necessary to find an agency relationship between the parties. *Ruddy*, 179 Or at 702. There is evidence in the record from which one reasonably could infer that EHC consented to Hampton's acting as its agent. One could infer, from the statements made in John Hampton's deposition, that John Hampton understood EHC to have consented to his acting as EHC's agent for the sale of the mill. Those statements create a question of fact as to whether EHC consented to have Hampton act as its agent, sufficient to defeat a motion for summary judgment.

On summary judgment, EHC has established facts from which one reasonably could infer that a principal-and-agent relationship existed between the parties for the sale of the mill, that such a relationship imposed a standard of care independent of the terms of the parties' alleged contract to sell logs, and that, accordingly, the trial court erred in granting summary judgment to Hampton on EHC's claim for breach of fiduciary duty.

## NEGLIGENCE

On review in this court, Hampton argues that EHC's claim for negligence based on the relationship between the parties should fail, for the sole reason that no fiduciary relationship existed between the parties. Because there was evidence from which a trier of fact reasonably could find a principal-and-agent relationship, we conclude that there is evidence in the record — the same evidence discussed with respect to the previous claim — from which one reasonably could infer that Hampton was negligent when it failed to exercise reasonable care to market and sell the mill.

In summary, Hampton was not entitled to summary judgment on EHC's counterclaims on the basis of judicial estoppel. Except on EHC's claim for breach of contract to sell the mill, the trial court erred in granting summary judgment to Hampton on EHC's claims.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part. The case is remanded to the circuit court for further proceedings.[11]

---

[11] We do not decide what effect, if any, the jury verdict on Hampton's claim for breach of guaranty might have on remand of these counterclaims (e.g., in terms of issue preclusion).