465

Argued and submitted March 18, affirmed August 5, 1998

## CITY OF MEDFORD,
*Appellant,*

*v.*

## BEAR CREEK VALLEY SANITARY AUTHORITY,
City of Central Point, City of Jacksonville
and City of Phoenix,
*Respondents.*

(97-0086-E3; CA A98721)

963 P2d 120

James E. Mountain, Jr., argued the cause for appellant. With him on the brief were Brendan C. Dunn and Harrang Long Gary Rudnick P.C.

Lee A. Mills argued the cause for respondents Bear Creek Valley Sanitary Authority, City of Central Point and City of Phoenix. With him on the brief were Mills, Schmor, Gerking & Brophy, LLP, Larry L. Kerr, and Douglas M. Engle.

Robert E. Bluth argued the cause for respondent City of Jacksonville. With him on the brief were Richard Billin and Robert E. Bluth, Attorney at Law, P. C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

Plaintiff appeals a judgment entered for defendants after the trial court granted defendants' motion for summary judgment and denied plaintiff's motion. We review the cross-motions for summary judgment as a matter of law, *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 613, 892 P2d 683 (1995), and affirm.

The facts are undisputed. Plaintiff, the City of Medford, and defendants, the Cities of Central Point, Phoenix, and Jacksonville, and Bear Creek Valley Sanitary Authority (Bear Creek), participate in a regional sewage treatment arrangement. The arrangement is governed by the Regional Sewer Agreement (Agreement), dated September 15, 1985. The Agreement establishes a Regional Committee (Committee), comprised of one representative from each of the five participants. Each representative has one vote. Plaintiff operates the sewage treatment plant that receives sewage from the participants through pipes called interceptors. Bear Creek, a joint water and sanitary authority,[1] operates the interceptor system. The interceptor system was built 27 years ago, and has had two major capital improvements since then.

On November 18, 1996, the Committee considered a resolution that proposed adopting a method of generating funds for the future improvement of the interceptor system. That proposal provides, in part:

"An Interceptor Capital Expense Fee shall be established and maintained by [Bear Creek]. This fee shall be used for a Master Plan Study and needed capital improvements to the interceptor system as approved by the [Committee] from time-to-time. Funds may be disbursed to pay for engineering studies, plans, specifications, and construction for interceptor enlargement, * * * provided, however, that before any such funds are disbursed, the [Committee] shall approve the same pursuant to the terms of the [Agreement]."

---

[1] Bear Creek Valley Sanitary Authority was created pursuant to ORS 450.600 *et seq*.

The funds would be generated by an ongoing monthly charge to the participants. The fund would apply $300,000 to the Master Plan Study, and then continue to collect funds for future interceptor system improvements. The purpose of the Master Plan Study would be to determine whether there is a current need to improve the interceptor system.

Defendants supported the resolution. The smaller cities expressed their concern about the expected future need for major expansion of the interceptor system due to the expected increase in population in the areas served by the Agreement. They were concerned that it would be financially difficult for them to produce a large outlay of funds when the need for expansion arose and preferred to save for future expansion over time. In addition, Bear Creek complained that asking the Committee for funding takes a long time and argued that planning ahead is most efficient. Plaintiff agreed to fund its portion of the Master Plan Study but did not support the collection of fees and questioned the authority of the Committee to do so. Plaintiff argued that the Committee did not have authority under the Agreement to approve Bear Creek's collection of funds for improvement to the interceptor system before Bear Creek had first found a current need for interceptor system improvement, determined proportionate cost allocations, prepared engineering and financing reports and submitted them to the Committee.[2] Plaintiff argued that the funds used to prepare the Master Plan Study and related reports that establish a need for improvement are properly a part of the interceptor system operation and maintenance budget allocated to Bear Creek, as provided in Section III(C)(3) of the Agreement. The other participants disagreed.

The resolution was passed, with plaintiff's representative voting "no," and the other four participants voting for it. Plaintiff subsequently filed a civil action against defendants, seeking a judgment declaring the resolution void and releasing plaintiff from its obligation to collect the monthly

---

[2] State law requires Bear Creek to have an "overall coordinated plan" for the operation of the existing system and for its improvement. ORS 450.825. That general plan is revised "from time to time as circumstances may require." *Id.* The engineering and financing plans plaintiff refers to are in addition to the general plan, and are specific to a particular improvement project.

charges from Medford customers. The court entered a declaratory judgment in favor of defendants holding that the resolution is valid and that plaintiff is required to collect the monthly charges required by the resolution.

On appeal, plaintiff assigns error to the trial court's granting of defendants' motion for summary judgment, the denial of plaintiff's motion, and also assigns error to the entry of the declaratory judgment for defendants. Defendants argue that the trial court properly entered summary judgment in their favor because the increase in fees was authorized by the Agreement, and the Agreement requires that a need exist and engineering plans be created only before the expenditure of collected funds.

The Agreement between the five parties was created expressly under the authority of ORS 190.010[3] "to provide for the operation, maintenance and expansion of the regional sewage treatment facility and interceptor system." Under the Agreement, each party "is vested with all the powers, rights and duties relating to those functions and activities that are vested by law in each separate party to the agreement[.]" ORS 190.030(1).

We note at the outset that each of the cities is authorized to collect a "sewage charge" by ORS 224.510[4] and

---

[3] ORS 190.010 provides, in part:

"A unit of local government may enter into a written agreement with any other unit or units of local government for the performance of any or all functions and activities that a party to the agreement, its officers or agencies, have authority to perform. The agreement may provide for the performance of a function or activity:

"(1) By a consolidated department;

"(2) By jointly providing for administrative officers;

"(3) By means of facilities or equipment jointly constructed, owned, leased or operated;

"(4) By one of the parties for any other party;

"(5) By an intergovernmental entity created by the agreement[.]"

[4] ORS 224.510 provides:

"(1) Unless prohibited by its charter, a city may impose on the users of water a sewage charge which shall be billed and collected by the city. The proceeds of the sewage charge may be used for paying, in whole or in part, the cost of planning, constructing or operating a sewage disposal system.

"(2) The sewage charge shall be established and the rate fixed by the city's governing body."

each of their respective city charters for the purpose of "planning, constructing, or operating a sewage disposal system." Bear Creek is similarly authorized to collect a "sewer service fee" by ORS 450.880[5] for the purpose of "financing the improvement, operation, and maintenance of a sewage disposal or drainage system."[6] We conclude that each party to the Agreement has legal authority to collect a sewage fee for future improvement and construction, and the question is, therefore, whether the Agreement limits the powers of the parties to collect such a fee.

We construe the Agreement as a matter of law. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). In construing the Agreement, we follow three steps. We first examine the document to determine its meaning. We do so without inserting what has been omitted, and without omitting what has been included. If the meaning is clear, our inquiry is at an end. *Id.*

We turn to the examination of the text and context of the Agreement. Under the heading, "Division of Responsibility," section III of the Agreement outlines the powers and responsibilities of plaintiff in subsection A, and Bear Creek in

---

[5] ORS 450.880 applies to "sanitary authorities." Bear Creek is a joint water and sanitary authority, which "possesses all the duties, functions and powers granted to water authorities and to sanitary authorities under ORS 450.600 to 450.989." ORS 450.640(1). ORS 450.880 provides, in part:

"(1) The authority may adopt ordinances imposing sewage service charges within an area within the authority, for the purpose of financing the improvement, operation and maintenance of a sewage disposal or drainage system ⁎ ⁎ ⁎.

"(2) The board may contract with any city or district serving water in such area to collect such service charges with the water bills[.]"

[6] Plaintiff argues that Bear Creek's power to collect fees under ORS 450.880 is limited by the requirement of present need and procedures—the submittal of engineering and financing plans—required by ORS 454.280-.295. However, those statutes apply to sanitary *districts*, not sanitary authorities. ORS 454.275(4). Those statutes *do* apply to the City of Medford. *Id.* Thus, those statutes apply to Bear Creek only because they apply to plaintiff and the other cities. ORS 190.030(1). As we discuss below, under the Agreement, plaintiff collects SDC's for future construction without satisfying any such procedural requirements. Furthermore, apparently notwithstanding the requirements of ORS 454.280-.295 that apply prior to *construction* of treatment works, ORS 450.130 gives sanitary districts the power to collect "sewer service charges" for the purpose of "financing the construction, operation and maintenance of the sewage collection and disposal system." Neither ORS 224.510, 450.880, nor 450.130 requires any procedures to be followed before the respective municipalities *collect* fees for future improvement.

subsection B. Subsections A and B contain similar provisions for the expansion of the sewage treatment plant by plaintiff and for the enlargement of the interceptor system by Bear Creek. Both provisions contain a requirement that after Bear Creek and plaintiff have determined that a present need for expansion exists, they must prepare engineering and financing plans for the proposed expansion. Section III(B)(2) provides that when Bear Creek

"shall determine that the capacity of the Interceptor System should be increased to provide uninterrupted service to the Participants * * * [Bear Creek] shall cause to be prepared engineering plans, specifications and estimates of the cost of said enlargement and submit such plans, specifications and estimates to the Committee. The Committee shall determine the proportionate share of the cost of such enlargement to be borne by the Participants using the expanded or enlarged facility. [Bear Creek] shall proceed to expand or enlarge the Interceptor System when a financing plan therefore has been adopted by the Committee and its implementation assured."[7]

Plaintiff's provision is almost identical in content, except for one difference in the treatment of plant and interceptor expansion: Plaintiff, which is responsible for maintaining and improving the plant, receives Systems Development Charge (SDC) funds that are placed into a separate "Plant Construction Fund." Bear Creek is not granted a separate fund for construction by section III of the Agreement for the interceptors, which are improved every dozen years or so. Bear Creek thus depends upon the Committee to create and approve financing for interceptor expansion.

Plaintiff argues that because Bear Creek is required to find that a need for interceptor expansion exists and provide engineering and financing plans before it proceeds to enlarge the interceptor system, Bear Creek is required to fulfill those obligations before collecting any funds earmarked for expansion. However, plaintiff is also required by section

---

[7] Bear Creek explained to the trial court that the Committee can comply with section III(B)(2) by determining each party's proportionate share of the cost of a specific improvement and then adopting a financing plan which might provide that all or part of a participant's share be paid from its share of the fund. Plaintiff does not argue otherwise.

III(A)(2) to find that a need for plant expansion exists, and to provide engineering and financing plans before it proceeds to enlarge the plant, and yet it receives SDC's funds for construction. Under the Agreement, plaintiff is not required to wait until a need exists to collect funds and the Agreement does not set out different requirements for the participants. Therefore, the language requiring a finding of need must necessarily refer to the expenditure, not collection, of such funds, if approved by the Committee. Furthermore, section III(B)(3) requires that Bear Creek hold in a separate account "[a]ll funds held by [Bear Creek] for enlargement or expansion of the Interceptor System" and that those funds shall be "reported on to the Committee as is the [operation and maintenance] fund." Although Bear Creek does not receive SDCs or other funds specifically earmarked for construction through section III of the Agreement, Bear Creek must have the authority to otherwise collect and manage construction funds under the Agreement, if that portion of section III(B)(3) is to have any meaning at all.

Section IV is entitled "Regional Committee," and subsection F contains the powers of the Committee. Section IV(F)(8), which is entitled, "Approval of the Issuance of Bonds for Plant Expansion," provides, in part:

> "[Plaintiff] may propose plant expansion that is to be paid through the issuance of Revenue Bonds of the City of Medford * * *. The issuance of such bonds * * * shall be subject to the approval of the Committee. * * * The issuance of General Obligation bonds of a Participant to provide financing for plant expansion *or improvement of the Interceptor System* shall likewise be subject to approval by the Committee. Approval by the Committee shall also be accompanied by a rate increase to meet debt service requirements for the bond issue as in the case of Revenue Bonds. *Financing methods other than bonds may be used, if approved by the Committee.* In such case, the Committee shall set a base rate to meet whatever payments are required by the approved financing method." (Emphasis supplied.)

Defendants argue that the italicized sentence gives the Committee the power to approve the financing method proposed by Bear Creek. We agree. First, it is clear from the Agreement that the Committee is not responsible for implementing

expansion of the plant or interceptor system; it only approves plaintiff's or Bear Creek's plan to do so. Likewise, section III defines the powers of plaintiff and Bear Creek to initiate and implement such expansion. Section IV deals primarily with the Committee's financial powers. Therefore, the section III requirement that Bear Creek's power to expand is conditioned upon a finding of present need does not necessarily limit the Committee's exercise of financial power, which is defined in section IV. Secondly, although section IV(F)(8), above, refers primarily to the Committee's power to approve plaintiff's expansion of the plant through the issuance of bonds, the language of the paragraph shifts to include financing of enlargement of the interceptor system. The explicit words of the paragraph give the Committee power to approve alternate financing methods for expansion of the plant and the interceptor system. Indeed, in the context of the Agreement, the italicized portion of Section IV(F)(8) would not be necessary if it referred only to plant expansion because an alternate method for plant expansion—the Construction Fund—had already been created in Section III(A)(3)(b).

This interpretation is supported by the assumption contained in section III(B)(3) that Bear Creek may manage funds for expansion of the interceptor system so long as it keeps those funds separate. Furthermore, the resolution itself acknowledges that, with respect to the expenditure of the funds and implementation of expansion, "the [Committee] shall approve the [disbursement] pursuant to the terms of the [Agreement]," namely, section III. Thus, in the same way that plaintiff may collect SDCs into a construction fund and submit engineering plans, or request approval for the issuance of bonds only after it determines a need for expansion exists, the Committee may allow Bear Creek to collect fees for an expansion fund and later determine that a need for expansion exists and submit engineering and financing plans to the Committee. Because the terms of the Agreement in context are not ambiguous, the trial court did not err in granting defendants' motion for summary judgment and entering a declaratory judgment in favor of defendants.

Affirmed.